# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

GARY TERRAIL MAHDI,

        Defendant-Appellant.

FOR PUBLICATION
October 11, 2016
9:00 a.m.

No. 327767
Oakland Circuit Court
LC No. 2014-252234-FH

Before: SAAD, P.J., and JANSEN and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of two counts of possession with intent to deliver less than 50 grams of a controlled substance, MCL 333.7401(2)(a)(*iv*), and one count of possession with intent to deliver less than 5 kilograms of marijuana, MCL 333.7401(2)(d)(*iii*). Defendant was sentenced, as a fourth habitual offender, MCL 769.12, to concurrent sentences of 76 months to 40 years' imprisonment for the intent to deliver a controlled substance convictions and 76 months to 15 years' imprisonment for the intent to deliver marijuana conviction. We reverse and remand for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

On October 2, 2014, at approximately 10:00 a.m., the Oakland County Sheriff's Office executed a warrant at 45 Lantern Lane, an apartment in the North Hill Farms apartment complex in Pontiac, Michigan. Detective Daniel Main presented the affidavit for issuance of a search warrant before the warrant was issued. He explained at trial that on two occasions an informant entered 45 Lantern Lane, purchased drugs inside, left the apartment, and turned over the drugs to police. Detective Main testified that defendant was the subject of the investigation and was observed entering and exiting the 45 Lantern Lane location on multiple occasions. However, the affidavit did not name a particular individual. A search warrant for 45 Lantern Lane was issued on the basis of the affidavit.

Before executing the warrant, Detective Main conducted surveillance of the area. He observed defendant standing behind a Buick Regal in the parking lot of the apartment complex. Defendant moved around items in the trunk of the vehicle, closed the trunk, and walked into 44 Cherry Hill, another apartment in the complex, carrying a small bag in his hand. Detective Main

did not see defendant inside of the vehicle. It was later determined that the vehicle was not registered to defendant.

Following this surveillance, five officers executed the search warrant at 45 Lantern Lane. The two people in the house were secured. Detectives Main and Jason Teelander then walked to the Buick in the parking lot and looked inside. They spotted a small bag of marijuana in or near the center console. The two detectives, along with a uniformed officer, went to 44 Cherry Hill and knocked on the door. Defendant answered and stepped outside of the apartment. He was arrested for possession of marijuana and placed in the back of a police car. The detectives then spoke to defendant's mother, Emma Howard. She told them that 44 Cherry Hill was her apartment. Detective Main explained that the officers were investigating her son for drug trafficking and wanted "to make sure that he didn't have any drugs hidden in her house that she didn't know about." He asked her "if she [would] mind if we looked around and made sure there was nothing there." Howard gave them permission to conduct the search.

The detectives did not find contraband or drugs in the apartment at 44 Cherry Hill. Detective Teelander searched the bathroom. He saw men's clothing piled on the toilet seat and a cell phone next to the clothing. There were shoes on the floor, and a travel bag was opened. Detective Teelander seized the cell phone. The officers also confiscated a wallet and a set of keys from the couch in the living room. The wallet contained a receipt for AutoZone, various cards and receipts with defendant's name on them, and $971 in cash. The keychain included keys that could unlock 44 Cherry Hill, 45 Lantern Lane, and the Buick in the parking lot. The keychain also contained an AutoZone rewards card. Detective Main used a key on the keychain to unlock the Buick and retrieve the marijuana inside. He also found paperwork with defendant's name and the address at 44 Cherry Hill, and a phone box that matched the phone taken from Howard's apartment. In the trunk, Detective Main found men's clothing and a PlayStation 4.

The detectives returned to 45 Lantern Lane to continue searching the apartment. While searching the kitchen, Detective Main found a couple of boxes of sandwich baggies, a pair of latex gloves, and a pair of scissors. He testified at trial that the items were significant because sandwich baggies are often used to package smaller amounts of drugs for sale, latex gloves prevent a person from absorbing drugs into his or her skin during packaging, and scissors could be used to cut off portions of the baggies. In the kitchen garbage can, Detective Main located sandwich baggies with the corners missing, a syringe, and a receipt stub without a name. He explained at trial that one way of packaging drugs is to place the drug into one corner of a baggie, knot the remaining portion just above the drug, and separate the main part of the baggie from the portion holding the drug. In the living room, Detective Main found scales and a tin with eight individual bags of marijuana containing approximately 1 gram each. There were also "rolling papers" inside the residence.

In the dining area, Detective Main found a reusable Sam's Club bag on one of the chairs. Inside were CD's and PlayStation games, as well as a PlayStation 3. The bag also contained two bags of marijuana, a digital scale, and a nylon case with individually packaged bags of heroin and one bag of cocaine. The two bags of marijuana were approximately 6 grams and nearly 11 grams in weight. The bags of heroin ranged in weight. The powdered cocaine found in the nylon container weighed approximately 1.6 grams. There was also a small amount of crack

cocaine in the bottom of the Sam's Club bag. Detective Main testified that the heroin and cocaine were worth about $800 to $900. He also testified that digital scales are often used in drug trafficking to weigh drugs for both sale and purchase.

There were two receipts in the Sam's Club bag. A September 7, 2014 receipt for the Comfort Suites in Auburn Hills listed defendant's name and the address at 44 Cherry Hill. The other receipt, dated August 22, 2014, was for the McGuire's Motor Inn on Telegraph Road, and listed defendant's name and the address at "41 Cherry Hill." The bag also contained an AutoZone rewards card with 16 numbers under the bar code, which matched the numbers on the rewards card attached to the keychain found at 44 Cherry Hill. The AutoZone receipt found in the wallet listed four numbers that were the same as the last four numbers on the AutoZone rewards card.

While Detective Main was writing his police report, he kept the cell phone from Howard's apartment. The phone rang several times and received some text messages. Some of the texts mentioned "G" or "Gary," and there were numerous photographs of defendant in the phone. Detective Main responded to some of the text messages. He recounted several text message exchanges at trial. At 6:02 p.m., an incoming message stated, "[H]ave those 4 15 milligram oxycodones, trade you for a 25, they go for 9 to 12 dollars, you said you would today, pretty please." At 6:21 p.m., another message stated, "[N]eed 20, have cash, call me. ASAP." Detective Main asked, "[B]oy or girl?" The response was "girl, how long and will you do the pill deal for me, it's for that long haired beauty you like." Detective Main responded that he was "waiting on some more." Detective Main testified that boy is "street slang" for heroin, and girl is "street slang" for cocaine.

At 6:29 p.m., an incoming message stated, "[W]hat up, this Ton, I need some of that hookup." Detective Main asked, "[B]oy?" The incoming text answered, "[N]o, that hard." Detective Main responded, "[M]y bad, I'm waiting on some." The next text message stated, "[H]it me up as soon as you get it cause I'm missing out on a lot right now." Detective Main explained that "hard" is a street term for crack cocaine, and "soft" refers to powder cocaine. At 9:30 p.m., there was an incoming message stating, "[Y]ou around?" Detective Main responded via text message, "[Y]ou need something," and the answer was "100." Detective Main testified that this likely meant $100 worth of heroin. At 9:40 p.m., there was an incoming message asking "G" if he was at "the farms." When Detective Main responded, "[Y]eah, what's up," the person stated, "I need a 4 piece." Detective Main asked, "[B]oy or girl[?]" The answer was "girl." He explained at trial that "[t]he farms is what people in Pontiac call North Hill Farms," and "4 piece" means $40 worth of drugs.

Detective Main read into the record at trial relevant text messages from dates before the search and arrest. An incoming message from September 29, 2014, stated, "Liz want [sic] to know can you take her 2 GMS," which is an abbreviation for grams. The outgoing response was "regs," to which there was a reply of "no." The next outgoing message stated, "[T]hat's all I got is regs." Detective Main explained at trial that "regs" is a common street term for marijuana, particularly "lower level cheap marijuana." Detective Main testified that there were text messages on the cell phone from September 26, 2014, regarding setting up a meeting at McGuire's Motor Inn. Some additional text messages referred to being in North Hill Farms.

Before trial, defense counsel filed a motion to suppress the wallet, keys, and cell phone found at 44 Cherry Hill. Defense counsel argued that the items found at that location were not related to the possession or sale of drugs, were not connected to the Lantern Lane address, and were outside the scope of the search defendant's mother permitted. The prosecution asserted that defendant's motion was untimely, the items seized from 44 Cherry Hill were taken legally through a consent search, and the items were in plain view and known to be possibly incriminating by officers familiar with drug trafficking. At the motion hearing, the trial court denied defendant's motion as untimely and determined that denial was appropriate on the merits as well. The trial court concluded that the consent exception to the warrant requirement applied in this circumstance. Evidence stemming from the search of the wallet, keys, and cell phone was admitted into evidence at trial. Defendant was convicted and sentenced as stated, and this appeal followed.

## II. FOURTH AMENDMENT SEARCH AND SEIZURE

The main issue presented in this case is whether the seizure of the cell phone, wallet, and keys from 44 Cherry Hill, as well as the subsequent search of the cell phone, violated defendant's Fourth Amendment protection against unreasonable searches and seizures. Defendant contends that the seizure of the cell phone, wallet, and keys was unreasonable because there was no warrant permitting the police to seize the items, and no exception to the warrant requirement permitted the police officers to seize the items. We agree.

"We review de novo a trial court's ultimate decision on a motion to suppress on the basis of an alleged constitutional violation." *People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014). We review for clear error any findings of fact made during the suppression hearing. *Id*. " 'A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made.' " *Id*. (citation omitted). We review de novo the issue whether the Fourth Amendment was violated and the issue whether an exclusionary rule applies. *People v Corr*, 287 Mich App 499, 506; 788 NW2d 860 (2010).[1]

The United States and Michigan Constitutions protect against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The corresponding provision of the Michigan Constitution provides, in part, "The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures." Const 1963, art 1, § 11. Whether a search or a seizure is lawful depends on whether it is reasonable.

---

[1] We note that although the trial court concluded that the motion to suppress was untimely, the court nevertheless held a hearing on the motion and reached a conclusion on the underlying issue.

*People v Nguyen*, 305 Mich App 740, 751; 854 NW2d 223 (2014). Thus, " 'a search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy.' " *People v Antwine*, 293 Mich App 192, 195; 809 NW2d 439 (2011) (citation omitted).

"In general, searches conducted without both a warrant and probable cause to believe evidence of wrongdoing might be located at the place searched are unreasonable per se." *Lavigne v Forshee*, 307 Mich App 530, 537; 861 NW2d 635 (2014). " 'And, generally, when evidence has been seized in violation of the constitutional prohibition against unreasonable searches and seizures, it must be excluded from trial.' " *People v Chowdhury*, 285 Mich App 509, 516; 775 NW2d 845 (2009) (citation omitted). However, there are several exceptions to the warrant requirement. See *Lavigne*, 307 Mich App at 537-538.

With regard to the search of the contents of a cell phone, the United States Supreme Court recently held that a warrant is generally required before searching the information contained in a cell phone. *Riley v California*, 573 US ___, ___; 134 S Ct 2473, 2493; 189 L Ed 2d 430, 451 (2014). However, the Court clarified that "even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone." *Id*. at ___; 134 S Ct at 2494; 189 L Ed 2d at 451. Thus, the search of the contents of a cell phone generally requires a warrant, unless a case-specific exception applies.

A. STANDING

We first address the issue whether defendant had standing to contest the search of 44 Cherry Hill and the seizure of the wallet, cell phone, and keys. The right to be free from unreasonable searches and seizures is personal, and the right cannot be invoked by a third party. *People v Brown*, 279 Mich App 116, 130; 755 NW2d 664 (2008). "For an individual to assert standing to challenge a search, the individual must have had a legitimate expectation of privacy in the place or location searched, which expectation society recognizes as reasonable." *Id*. A court determines the issue of standing by examining the totality of the circumstances, and a defendant bears the burden of establishing that he has standing. *Id*.

> Factors relevant to the determination of standing include ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. [*Id*. (citation and quotation marks omitted).]

The totality of the circumstances in this case establishes that defendant had a legitimate expectation of privacy in his mother's apartment that society recognizes as reasonable. The police officers recovered from the Buick several items indicating that defendant resided at 44 Cherry Hill with his mother, including tax paperwork listing defendant's name and the address of 44 Cherry Hill. The detectives also recovered a collections notice for defendant at 44 Cherry Hill, and Friend of the Court paperwork for defendant, which also listed 44 Cherry Hill as his address. Finally, the officers found a land sale registration form signed by defendant listing 44

Cherry Hill as his address. Defendant answered the door when the police officers arrived at 44 Cherry Hill, indicating that he had control over the apartment and the ability to regulate its access. Additionally, the officers found defendant's personal belongings in 44 Cherry Hill after arresting defendant. The totality of the circumstances of this case, therefore, indicates that defendant had a legitimate expectation of privacy with regard to 44 Cherry Hill that was objectively reasonable because he resided at the residence with his mother and had the ability to control the area searched and items seized. Accordingly, defendant had standing to challenge the search of 44 Cherry Hill and the seizure of the wallet, keys, and cell phone.

## B. CONSENT

We next turn to the issue whether the police violated defendant's Fourth Amendment right against unreasonable searches and seizures when the officers searched 44 Cherry Hill and seized the wallet, keys, and cell phone. It is uncontested that the officers did not have a warrant to search 44 Cherry Hill. Thus, the search was unreasonable per se, and an exception to the warrant requirement was necessary in order for the search to be reasonable. The trial court determined that the search and seizure was valid under the consent exception to the warrant requirement. Consent is an exception to the warrant requirement. *Lavigne*, 307 Mich App at 538. The consent exception permits a search and seizure if the consent is unequivocal, as well as specific and freely and intelligently given. *Id*. "Whether consent to search is freely and voluntarily given presents a question of fact that must be determined on the basis of the totality of the circumstances[.]" *Id*. The consent must be given by the person whose property is searched or from a third party possessing common authority over the property. *Brown*, 279 Mich App at 131. " 'The trial court's decision regarding the validity of the consent to search is reviewed by this Court under a standard of clear error.' " *People v Frohriep*, 247 Mich App 692, 702; 637 NW2d 562 (2001) (citation omitted). Consent to search may be limited in scope, and consent may be revoked. *Id*. at 703. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Id* (citation and quotation marks omitted). Further, " '[t]he scope of a search is generally defined by its expressed object.' " *People v Dagwan*, 269 Mich App 338, 343; 711 NW2d 386 (2005) (citation omitted).

The parties do not contest that defendant's mother had the authority to give consent to search her apartment. Instead, the parties dispute whether the items seized were within the scope of the consent. At trial, Detective Main testified as follows:

> I told Ms. Howard why we were there. Uh, I told her that we were investigating her son for, for drug trafficking. I told her that I wanted to make sure that he didn't have any drugs hidden in her house that she didn't know about and I asked her if she mind [sic] if we looked around and made sure there was nothing there.

Detective Teelander testified that "Detective Main, uh, told him why we were there – or told her why we were there – and explained the situation and asked if, uh, if we mind-, if she would consent to letting us search her apartment for any illegal drugs or anything." Howard consented to the search, and the officers proceeded to search the apartment and seize the wallet, keys, and cell phone. The testimony establishes that a reasonable person would have believed that the

scope of the search pertained to illegal drugs hidden in the apartment. Howard's consent to search her apartment for the limited purpose of uncovering illegal drugs did not constitute consent to seize *any* item. The seizure of the wallet, keys, and cell phone, therefore, fell outside the scope of Howard's consent.

## C. PLAIN VIEW

Furthermore, the officers were not entitled to seize the wallet, keys, and cell phone under the plain view exception to the warrant requirement because the incriminating character of the items seized was not immediately apparent. "The plain view exception to the warrant requirement allows a police officer to seize items in plain view if the officer is lawfully in the position to have that view and the evidence is obviously incriminatory." *People v Galloway*, 259 Mich App 634, 639; 675 NW2d 883 (2003). An item is obviously incriminatory, meaning its incriminating nature is immediately apparent, if "without further search the officers have 'probable cause to believe' the items are seizable." See *People v Champion*, 452 Mich 92, 102; 549 NW2d 849 (1996) (citation omitted). The rationale behind the plain view doctrine is police convenience, as "[i]t would be unreasonably inconvenient to require the police, once they have made a valid intrusion and have discovered probable evidence in plain view, to leave, obtain a warrant, and return to resume a process already in progress." *Id*. at 101-102.

The prosecution's argument that the items were properly seized under the plain view exception is without merit because the incriminating nature of the wallet, keys, and cell phone was not immediately apparent. Instead, further investigation was necessary in order to establish a connection between the items and the suspected criminal activity. With regard to the set of keys, the officers were required to conduct further investigation in order to determine that the keychain contained keys for the Buick, 44 Cherry Hill, and 45 Lantern Lane. The officers also performed an additional search to conclude that the rewards card on the keychain contained a 16-digit bar code matching the bar code of a rewards card found in the Sam's Club bag. With regard to the wallet, the officers conducted additional investigation in order to determine that the wallet contained a large amount of cash and an AutoZone receipt with four numbers matching the last four numbers found on a rewards card located in the Sam's Club bag. With regard to the cell phone, Detective Main conducted further investigation of the phone by searching through text messages, and even responding to text messages, in order to locate evidence connecting defendant with drug sales. Therefore, the incriminating nature of these items was not immediately apparent, and the plain view exception to the warrant requirement did not apply in this context.

## D. PROBATIONER STATUS

On appeal, the prosecution relies, in large part, on the United States Supreme Court's decision in *United States v Knights*, 534 US 112; 122 S Ct 587; 151 L Ed 2d 497 (2001), for the proposition that the officers were only required to have reasonable suspicion that criminal activity was occurring in order to conduct the search of the apartment and seize the wallet, keys, and cell phone. In *Knights*, the respondent was sentenced to probation for a drug offense and signed a probation order including the condition that the respondent "would '[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law

enforcement officer.' " *Id*. at 114 (alteration in original). The probation order also included a provision acknowledging receipt of a copy of the probation order, and indicating that the respondent read and understood the terms and conditions of probation and agreed to abide by them. *Id*. After the respondent was placed on probation, police officers began to suspect that the respondent was involved in setting a power transformer and telecommunications vault on fire. *Id*. at 114-115. The fire occurred after the company owning the power transformer filed a theft of service complaint against the respondent and shut off his electric service. *Id.* A detective set up surveillance of the respondent's apartment and saw the respondent's suspected accomplice carrying items that the detective believed were pipe bombs. *Id*. at 115. The detective looked into the accomplice's truck and saw several explosive materials and items, as well as padlocks matching the description of those removed from the transformer vault. *Id*. The detective then conducted a search of the respondent's apartment, which revealed additional incriminating items. *Id*.

The United States Supreme Court concluded that the search was reasonable under the totality of the circumstances, and the probation search condition was a "salient circumstance." *Id*. at 118. The Court discussed the fact that probationers do not have the absolute liberty that ordinary citizens have and noted that the condition in the probation order significantly diminished the respondent's reasonable expectation with regard to his privacy. *Id*. at 119-120. The Court further noted that probationers are more likely to violate the law than ordinary citizens and that probationers have more incentive to conceal and dispose of incriminating evidence. *Id*. at 120. Thus, the Court held that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." *Id*. at 121.[2] The Court reasoned that "[t]he degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." *Id*. Under the circumstances of the case, the balance of governmental and private interests warranted a reasonable suspicion standard. *Id*. The Court concluded, "When an officer has reasonable suspicion that a probationer *subject to a search condition* is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id*. (emphasis added).[3]

This case is distinguishable from *Knights*, however, because the prosecution did not submit evidence regarding the conditions of defendant's probation in the trial court. Defendant's

---

[2] "In determining reasonableness, the court must consider whether the facts known to the officer at the time . . . would warrant an officer of reasonable precaution to suspect criminal activity." *People v Steele*, 292 Mich App 308, 314; 806 NW2d 753 (2011). Further, " '[t]he reasonableness of an officer's suspicion is determined case by case on the basis of the totality of all the facts and circumstances.' " *Id*.

[3] See also *Knights*, 534 US at 122 (SOUTER, J., concurring) ("We now hold that law-enforcement searches of probationers *who have been informed of a search condition* are permissible upon individualized suspicion of criminal behavior committed during the probationary period . . . .") (emphasis added).

presentence investigation report (PSIR) indicates that he was on probation at the time the instant offense was committed. In response to defendant's motion to suppress, the prosecution did not contend that the search was reasonable under the probation exception to the warrant requirement, instead relying on the consent and plain view exceptions to the warrant requirement. Consequently, the signed conditions of defendant's probation do not appear in the lower court record. In *Knights*, the United States Supreme Court indicated that the probation search condition was a *salient* circumstance within the totality of the circumstances in determining whether the search of the respondent's residence was reasonable. *Knights*, 534 US at 118. In this case, we cannot examine defendant's probation conditions because the probation conditions are not contained in the record.[4] Without the probation conditions, there is insufficient evidence in the record to conclude that the officers had reasonable suspicion that a probationer *subject to a search condition* was engaged in criminal activity. See *id*. at 121.[5]

The prosecution attaches to its brief on appeal a "probation/parole orientation guide," which is not signed by defendant. The document that the prosecution provides on appeal states, in relevant part, "If applicable, explained Nighthawk or enhanced supervision programs, advising the offender that the agent, possibly with law enforcement, may make unannounced home visits during evening and weekend hours to ensure compliance with the probation/parole order."[6]

---

[4] The PSIR contains recommended probation conditions in relation to defendant's previous conviction, but it is unclear whether the trial court adopted those recommendations. Further, there is no search condition listed in the recommended probation conditions.

[5] The prosecution relies on this Court's opinion in *People v Glenn-Powers*, 296 Mich App 494; 823 NW2d 127 (2012), in support of the conclusion that the officers were permitted to search Howard's residence and seize the cell phone, keys, and wallet if the officers had reasonable suspicion that defendant was engaging in criminal activity. However, the statements regarding *Knights* in *Glenn-Powers* constituted nonbinding obiter dicta. "Obiter dicta are not binding precedent. Instead, they are statements that are unnecessary to determine the case at hand and, thus, 'lack the force of an adjudication.'" *People v Peltola*, 489 Mich 174, 190 n 32; 803 NW2d 140 (2011) (citation omitted). The issue in *Glenn-Powers* was whether the defendant, a probationer, was lawfully arrested under a warrant for violation of his probation when the warrant was not sworn under oath. *Glenn-Powers*, 296 Mich App at 496. *Glenn-Powers* did not involve a search and seizure, and, therefore, this Court's discussion regarding the rule from *Knights* constituted mere obiter dicta. See *Peltola*, 489 Mich at 190 n 32.

[6] In addition to this provision, the prosecution points to another provision in the probation/parole orientation guide, which states:

> Advised offender that prohibited drug and alcohol use will be taken seriously and will involve immediate corrective action which could include, in addition to verbal warning and counseling, meetings with pro-social supports and/or assessments for treatment programs. Offenders who fail to respond positively to these corrective actions could incur increased interventions which may include jail detention, residence searches and/or increased supervision.

Even assuming that defendant agreed to this condition, the condition differs substantially from the condition in *Knights*. First, the condition does not explain when it is applicable, and it is unclear whether this provision applied to the circumstances of defendant's probation. Second, the condition merely states that an agent and law enforcement officers may make unannounced home visits, and does not include language indicating that defendant would submit his property or residence to a search without a search warrant or reasonable cause, which was the provision at issue in *Knights*. See *Knights*, 534 US at 114. Accordingly, we conclude that, even assuming that defendant agreed to the above probation provision, the provision is distinguishable from the provision at issue in *Knights*.

Finally, even assuming that the probation conditions that the prosecution attaches to its brief on appeal applied to defendant and that the officers had reasonable suspicion to conduct a search of 44 Cherry Hill with regard to defendant's suspected drug activity, we conclude that the seizure of the items found in 44 Cherry Hill did not fall under the probation exception outlined in *Knights*. Although the *Knights* Court clarified that an officer may search the home of a probationer subject to a search condition if the officer has reasonable suspicion that the probationer is engaged in criminal activity, the Court was silent with regard to the justification for the seizure of the items taken from the respondent's home. *Knights*, 534 US at 121. We decline to expand the holding in *Knights* to permit the seizure of *any* item found in a probationer's home if there is reasonable suspicion of criminal activity permitting a search of the home. In *Knights*, the incriminating nature of the items seized, which included "a detonation cord, ammunition, liquid chemicals, instruction manuals on chemistry and electrical circuitry, bolt cutters, telephone pole-climbing spurs, drug paraphernalia, and a brass padlock stamped [with the name of the company that was the victim of arson]" was immediately apparent in light of the circumstances in that case, and thus would have been subject to seizure under the plain view exception to the warrant requirement when the officers searched the home. *Id*. at 115.

In this case, as discussed above, the items seized from 44 Cherry Hill were not obviously incriminating, and thus did not fall under the plain view exception to the warrant requirement. Even if the officers were only required to have reasonable suspicion that the items were used for illegal drug activities in order to seize the items, the officers had nothing more than a hunch that the cell phone, wallet, and keys were connected with drug activity based on their experiences with similar items in the past, and the officers lacked any particularized suspicion with regard to the specific items seized. See *Champion*, 452 Mich at 98 ("Reasonable suspicion entails something more than an inchoate or unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause."). Accordingly, even assuming that the reasoning from *Knights* applied in this case, *Knights* does not justify the seizure of the cell phone, keys, and wallet from 44 Cherry Hill.

---

It is clear that this provision does not apply to this situation, however, because there was no indication that defendant used any drugs, and there was no immediate corrective action, which was required before increased interventions occurred.

## E. INEVITABLE DISCOVERY

We also agree with defendant that the cell phone, keys, and wallet do not fall under the scope of the inevitable discovery doctrine. "The inevitable discovery doctrine is recognized in Michigan and may justify the admission of otherwise tainted evidence that ultimately would have been obtained in a constitutionally accepted manner." *People v Brzezinski*, 243 Mich App 431, 436; 622 NW2d 528 (2000). The inevitable discovery rule permits the admission of evidence obtained in violation of the Fourth Amendment if the prosecution establishes by a preponderance of the evidence that the information inevitably would have been discovered through lawful means. *Id*. at 435. This Court has cited several factors in determining whether the inevitable discovery rule applies, including (1) were the legal means truly independent, (2) was the use of the legal means and the discovery by the legal means truly inevitable, and (3) could application of the inevitable discovery doctrine incentivize police misconduct or significantly weaken the protection provided under the Fourth Amendment. *Id*. at 436.

There is no indication that the officers would have inevitably discovered the wallet, keys, and cell phone through legal means. Even assuming that the officers had probable cause to obtain a warrant for the keys, wallet, and cell phone, the officers were not in the process of obtaining a warrant when they seized the items. See *People v Hyde*, 285 Mich App 428, 445; 775 NW2d 833 (2009) (reasoning that the evidence at issue in the case should have been excluded because, even though there was probable cause to obtain a warrant, and the evidence would have been obtained through a warrant, the police were not in the process of obtaining the warrant at the time of the seizure). Additionally, application of the inevitable discovery doctrine in this context would incentivize police misconduct and significantly weaken Fourth Amendment protections because it would permit police officers to evade the warrant requirement and would permit the seizure of an item whenever there is probable cause. See *id*. ("To allow a warrantless search merely because probable cause exists would allow the inevitable discovery doctrine to act as a warrant exception that engulfs the warrant requirement."). Therefore, the inevitable discovery doctrine does not apply to the seizure of the cell phone, wallet, and set of keys. Accordingly, the cell phone, the wallet and its contents, and the keychain should have been excluded from trial.

## F. FRUIT OF THE POISONOUS TREE

We next conclude that the text messages obtained from the cell phone fell under the exclusionary rule as products of the illegal seizure of the cell phone. "[T]he exclusionary rule prohibits the introduction into evidence of materials and testimony that are the products or indirect results of an illegal search, the so-called 'fruit of the poisonous tree' doctrine." *People v Stevens*, 460 Mich 626, 633-634; 597 NW2d 53 (1999). In *Wong Sun v United States*, 371 US 471, 487-488; 83 S Ct 407; 9 L Ed 2d 441 (1963), the United States Supreme Court clarified:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." [Citation omitted.]

-11-

The text messages on the cell phone were clearly obtained through exploitation of the illegal seizure of the cell phone. After the officers seized the cell phone, Detective Main searched the phone and even engaged in several conversations via text message in order to obtain additional incriminating evidence against defendant. The process through which the text messages were obtained, therefore, was not sufficiently distinguishable to be purged of the primary taint of the illegal seizure of the cell phone, and the text message evidence constituted a fruit of the original illegal actions of the police.

## G. HARMLESS ERROR

We further conclude that defendant is entitled to a new trial because the prosecution failed to establish that the admission of the evidence regarding the items seized in violation of the Fourth Amendment was harmless beyond a reasonable doubt. With regard to the preserved, nonstructural constitutional error at issue in this case, in order to show that the error was harmless and that reversal is not required, the prosecution must "prove, and the court [must] determine, beyond a reasonable doubt that there is no reasonable possibility that the evidence complained of might have contributed to the conviction." *People v Anderson (After Remand)*, 446 Mich 392, 405-406; 521 NW2d 538 (1994) (citation and quotation marks omitted).

The prosecution cannot establish that there is no reasonable probability that the evidence contributed to defendant's conviction. The keychain contained a key for 45 Lantern Lane and a key to the Buick. The testimony regarding the keychain was admitted to show a connection between defendant and the Buick, in which marijuana was found, and a connection between defendant and 45 Lantern Lane, in which drugs and drug paraphernalia were found. Also attached to the keychain was an AutoZone rewards card, which showed a connection between defendant and the Sam's Club bag because the 16 numbers on the bar code for the rewards card attached to the keychain matched the 16-number bar code on the rewards card found in the Sam's Club bag. With regard to the wallet, the police found a receipt for AutoZone, various cards with defendant's name on them, and $971 in cash. Detective Main testified at trial that the amount of money found in the wallet was indicative of drug sales. Testimony regarding the AutoZone receipt was used at trial to connect defendant with the Sam's Club bag because four numbers on the receipt matched four numbers found on the rewards card in the Sam's Club bag.

Finally, with regard to the cell phone, Detective Main read into evidence text message conversations from the cell phone and explained how the text messages referred to drug sales. The text messages referred to "G" or "Gary," and contained pictures of defendant, which connected defendant to the cell phone and the drug sales discussed in the text messages. The text messages were highly incriminating because they not only tied defendant to the drugs found at 45 Lantern Lane, but also indicated that defendant was engaged in drug sales. Indeed, Detective Main testified at trial that, after examining the text messages and the other evidence in the case, it was more likely that the drugs were possessed with the intent to deliver.

For the reasons discussed, the evidence from the cell phone, wallet, and keychain was highly prejudicial to the defense. The items served to connect defendant with the drugs found at 45 Lantern Lane and in the Buick, as well as to establish that defendant was engaged in drug dealing. Without the testimony regarding these items, the only evidence presented at trial connecting defendant with the drugs found in the Sam's Club bag included the two motel

receipts bearing defendant's name, as well as Detective Main's testimony that he saw defendant entering and exiting 45 Lantern Lane on several occasions. Although this evidence was incriminating, it does not establish, beyond a reasonable doubt, that there is no reasonable possibility that the evidence complained of might have contributed to the conviction. Rather, the cell phone, keys, and wallet were vital to the prosecution's case against defendant, and, accordingly, there is a reasonable probability that this evidence contributed to his conviction. For this reason, we cannot conclude that the error in admitting the evidence was harmless beyond a reasonable doubt.

Finally, we note that defendant raises several additional arguments in his brief on appeal, regarding (1) whether the text messages from the cell phone constituted inadmissible hearsay under MRE 801 and MRE 802, (2) whether Detective Main's testimony that the drugs were possessed with the intent to deliver denied defendant his right to due process by improperly invading the province of the jury, and (3) whether defendant's upward departure sentence was unreasonable. However, in light of our conclusion regarding defendant's Fourth Amendment arguments, we need not reach the merits of these additional issues.

## III. CONCLUSION

We conclude that, although the officers received valid consent to search 44 Cherry Hill, the officers did not have a warrant permitting the seizure of the cell phone, wallet, and keys, and the seizure of these items fell outside the scope of the consent. In addition, no exceptions to the warrant requirement applied in this circumstance, and the evidence does not fall under the scope of the inevitable discovery doctrine. Thus, the cell phone, wallet, and set of keys should have been excluded from trial. Finally, the admission of the evidence was not harmless beyond a reasonable doubt. Accordingly, defendant is entitled to a new trial.

Reversed and remanded for a new trial. We do not retain jurisdiction.

/s/ Henry William Saad
/s/ Kathleen Jansen
/s/ Michael J. Kelly