*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 4, 2023

Plaintiff-Appellant,

v

No. 361204
Wayne Circuit Court
LC No. 21-005542-01-FH

TERRENCE CHARLES HICKS,

Defendant-Appellee.

Before: RICK, P.J., and M. J. KELLY and RIORDAN, JJ.

RICK, P.J. (*dissenting*).

I respectfully disagree with the majority's holding that the police did not commit a search of defendant for purposes of the Fourth Amendment. The egregious facts of this case do not support the majority's conclusion that the police observed the pistol holster inside defendant's waistband "in plain view" from "a public vantage point." I would affirm the circuit court's decision to grant defendant's motion to suppress evidence on the basis that the police lacked reasonable, articulable suspicion of criminal activity by defendant to justify an unlawful *Terry* stop.

## I. FACTS

On the afternoon of October 13, 2020, several Detroit police officers were returning to their "base" in a marked raid van and two fully marked patrol vehicles. They came upon a group of five to eight individuals who were gathered in the street and consuming alcoholic liquor in

violation of state law and city ordinance.[1] The group was blocking the police vehicles' path. As the police vehicles approached the group, the individuals started to disperse.

Detroit Police Officer Amir Amen-Ra, one of the officers involved in the incident, was the only officer to testify at the preliminary examination. He testified that some of the individuals from the group started walking "up the street beside [a] minivan that was parked there." The officers stopped to investigate "for open intoxicants." The bodycam videos from Officer Amen-Ra and Officer Mario Rodriguez showed that multiple officers rushed out of the police vehicles and went in different directions.[2] Officer Amen-Ra and at least three other officers immediately approached the passenger side of the minivan. The passenger side of the minivan faced the curb. The front passenger side door was closed and the window was down. A woman was sitting in the front passenger seat. The rear sliding passenger door was open. Defendant was sitting on the rear floorboard with his legs hanging out of the passenger side door with his right side angled slightly outward.

Officer Rodriguez's bodycam video showed that he immediately went to the passenger side door of the minivan. He reached inside and held defendant's right arm with one hand and used his other hand to grasp an item that was covered by defendant's sweatshirt. Officer Rodriguez pulled defendant from the minivan and placed him against the open minivan door while pulling a loaded gun from defendant's waistband. The timestamps on the bodycam videos indicate that approximately five seconds elapsed between the time when Officer Rodriguez exited the raid van and when he reached inside the minivan, grabbed defendant's arm, and pulled defendant from the minivan.

Officer Amen-Ra's bodycam video showed that he approached the passenger side of the minivan immediately behind and to the left of Officer Rodriguez while another officer approached the passenger side behind and to the right of Officer Rodriguez. An officer's arm can be seen reaching in from the left and assisting Officer Rodriguez with pulling defendant from the minivan.

According to Officer Amen-Ra, as he approached the minivan he could see that defendant had a clip for an inside-the-waistband holster on his belt. Officer Amen-Ra testified that defendant gestured to the clip. According to Officer Amen-Ra, Officer Rodriguez[3] then lifted defendant's shirt and recovered a loaded gun. Officer Amen-Ra testified that he did not see defendant in possession of alcohol. He did not observe defendant as part of the group in the street nor did he observe defendant walk toward the minivan. Officer Amen-Ra agreed that defendant could have

---

[1] See MCL 436.1915(1) and Detroit Ordinance, § 31-5-2 ("Alcoholic liquor shall not be consumed on public highways.") Consuming alcohol on a public highway is a misdemeanor. MCL 436.1909(1); Detroit Ordinance, § 31-1-1.

[2] The bodycam videos do not have sound until after the point at which defendant was pulled from the minivan.

[3] Officer Rodriguez did not testify at the preliminary examination and so it is not possible to determine what, if anything, Officer Rodriguez observed as he approached the minivan.

been seated in the minivan before the officers arrived. As a result of the encounter, defendant was charged with carrying a concealed weapon, MCL 750.227.

Defendant subsequently moved to suppress the seized gun in the circuit court, arguing that his Fourth Amendment rights were violated when defendant was subjected to an unlawful *Terry*[4] stop and, therefore, the evidence seized as a result of the stop had to be suppressed as fruit of the poisonous tree. Defendant argued that the officers did not have a reasonable, articulable suspicion that defendant was engaged in criminal activity when they approached the minivan.

The circuit court considered the preliminary examination transcript and the bodycam videos when making its decision. After hearing from the parties, the trial court granted defendant's motion to suppress, stating in relevant part:

> So, but the question is . . . how did they get to the van in the first place because the testimony . . . was there was a group of men in the street or people with open alcohol not—they said they were in the street and there might have been a couple standing next to the van and they said what drew their attention is they had to open up on them and that those people just looked at them gave eye contact to the van and then they dispersed from the van. But when the question was asked was [defendant] one of those people the answer was, no. The people that were in the street, it also came up in the exam, had to move because the van was coming down the street. So, it was nothing sinister about their movement. Per the testimony-you have to have reasonable suspicion, so the issue is how do we get to the van in the first place. That's where the issue is so, the—
>
> \* \* \*
>
> I understand that once they got to the van there was something that was seen, but the Court doesn't have an issue with that. And I saw the video and they claimed that when they got to the van, they saw the clip. The problem I have is how do you get to the van. On Page 36 Officer [Amen-Ra] says he observed the crowd consuming alcohol in the street in front of the location which I'm assuming is a house[,] five to eight in the crowd[,] traveling down Murray Hill the group walked away in saw [sic] the minivan and initially the group was in the street. The crew investigated the group in the street and he just went to the van and that's where they observed this clip. So, the question was asked on Page 42. Did you see Hicks with any alcohol, no, I didn't. . . . . I did not see him consuming any alcohol or an open container in his hand . . . .
>
> \* \* \*
>
> And nobody testified that [defendant] was a part of that group and went to the van thus, would necessitate a reason to go to the van, reasonable suspicion. If he's in the group, he's got open intoxicants the cops will come out and investigate because

---

[4] *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

they shouldn't have open intoxicants which is, I believe, a ticketible [sic] offense and they got to the van because they were—they were investigating individuals in the street who were drinking. But the testimony on the record was that they didn't even see [defendant] as a part of that crowd and he specifically said he could have been seated there [in the van] already. So, what would be the reason that they went to the van at all.

\* \* \*

They didn't follow somebody with alcohol in their had [sic] to the van. . . . They had no reason[,] there needs to be reasonable suspicion based on something as to why you're investigating you can't just jump out of your raid van and run to a van and then check somebody out who does not even apply to the crew. So, the [c]ourt is going to suppress.

The circuit court accordingly dismissed the case.

## II. STANDARD OF REVIEW

Findings of fact made after a suppression hearing are reviewed for clear error, while the ultimate decision on a motion to suppress is reviewed de novo. *People v Rodriguez*, 327 Mich App 573, 583; 935 NW2d 51 (2019). "A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that the trial court made a mistake." *Id*. (quotation marks and citation omitted). We review de novo the issue whether the Fourth Amendment was violated. *People v Mahdi*, 317 Mich App 446, 457; 894 NW2d 732 (2016).

## III. ANALYSIS

"The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures. The Michigan Constitution in this regard is generally construed to provide the same protection as the Fourth Amendment of the United States Constitution." *People v Vaughn*, __ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 356400); slip op at 4 (quotation marks and citations omitted). When an individual's Fourth Amendment rights have been violated as a result of an unreasonable search and seizure, an appropriate remedy is to suppress the evidence obtained as a result of that violation. *Terry v Ohio*, 392 US 1, 12; 88 S Ct 1868; 20 L Ed 2d 889, 911 (1968).

Usually, the police must "obtain advance judicial approval of searches and seizures through the warrant procedure[.]" *Terry*, 392 US at 20. "It is presumed that a warrantless search or seizure is unreasonable under the Fourth Amendment unless one of the few specific exceptions are applicable." *People v Turner*, __ Mich App __, __; __ NW2d __ (2022) (Docket No. 357699); slip op at 4. One such exception is a *Terry* investigative stop. *Johnson v VanderKooi*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 160958); slip op at 10. Under certain circumstances, a police officer may approach and temporarily detain a person for the purpose of investigating possible criminal behavior even though there is no probable cause to support an arrest. *Terry*, 392 US at 22. "A *Terry* stop allows an officer to conduct a brief, warrantless seizure when the officer has at least a reasonable suspicion of criminal activity based on articulable facts." *Terry*, 392 US

at 20-27. The determination whether there was reasonable suspicion to make an investigatory stop must be made case-by-case under the totality of the circumstances, and on the basis of common sense about human behavior. *People v Jenkins*, 472 Mich 26, 32; 691 NW2d 759 (2005). When determining whether a search and seizure was reasonable, it must be determined "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 US at 19-20. The Supreme Court explained that the question to be answered is "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id*. at 21-22 (quotation marks and citation omitted).

To determine whether an unreasonable search and seizure occurred, it must first be determined whether a search or seizure occurred at all, and when exactly the search or seizure occurred. As noted in *Terry*, 392 US at 19 n 16, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." This is because "[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Terry*, 392 US at 34 (White, J., concurring). See also *People v Shabaz*, 424 Mich 42; 378 NW2d 451 (1985). A seizure occurs when "a police officer accosts an individual and restrains his freedom to walk away[.]" *Terry*, 392 US at 16. In that situation, justification for a *Terry* stop must be present before the police may detain the person.

In the present case, multiple officers ran from the police vehicles and immediately surrounded the rear passenger door of the minivan where defendant was seated, blocking the only door defendant reasonably had access to. The initial encounter with defendant was not consensual. A reasonable person in defendant's situation would not have believed he was free to terminate the encounter, even before being grabbed by an officer. In my view, defendant was seized at the moment several officers approached and surrounded the minivan door and prevented defendant's egress.

At that point, the officers did not have a reasonable suspicion that defendant was committing a crime, or was about to commit a crime. No evidence was presented that defendant was in possession of or consuming alcoholic liquor, or that he was in the group that the officers observed in the street. No evidence was presented that defendant walked from the street to the minivan, or that he was ever outside of the minivan at any time before the officers approached the minivan. There were no articulable facts that would support a reasonable suspicion that defendant was involved in the criminal activity that the officers were investigating or that defendant was committing a crime when the officers surrounded the minivan. While I agree with the majority that the officers were "free to pass by both sides of the minivan on the street as they moved to investigate a potential violation of the law," the facts of this case, and particularly the bodycam videos, do not support the majority's conclusion that the officers observed the inside-the-waistband holster clip "from a public vantage point" on the public street "while on their way to investigate" but not "as a result of investigating those originally seen consuming alcohol on the street." Rather, the facts support that officers observed the holster clip when they approached and surrounded the minivan, purportedly as part of the investigating a potential violation of the law. Because the police did not have reasonable suspicion to justify the *Terry* stop, they violated defendant's Fourth Amendment rights. Consequently, the court properly suppressed the evidence because it was tainted by an unlawful stop.

I would affirm the circuit court's decision to grant defendant's motion to suppress evidence.

/s/ Michelle M. Rick