*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
December 7, 2023

v

MONTEZ RICARDO ROSS,

Defendant-Appellant.

No. 360155
Wayne Circuit Court
LC No. 19-007656-01-FC

Before: BOONSTRA, P.J., and GADOLA and MALDONADO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of assault with intent to murder, MCL 750.83, carrying a dangerous weapon with unlawful intent, MCL 750.226, carrying a concealed weapon, MCL 750.227, and two counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to 16 to 35 years' imprisonment for assault with intent to murder, two to five years' imprisonment for carrying a dangerous weapon with unlawful intent, two to five years' imprisonment for carrying a concealed weapon, and two years for each count of felony-firearm. We partially reverse the trial court's pretrial order denying defendant's motion to suppress evidence and remand this case for additional proceedings consistent with this opinion.

## I. BACKGROUND

This case arises from the nonfatal shooting of Johny Yako on February 24, 2019. The prosecution presented evidence that Yako met with defendant that day to purchase a drone. Although Yako did not know defendant's name, he had purchased other items from defendant in the past and was, therefore, familiar with defendant. Yako testified that defendant shot him after they disagreed on the price for the drone. Yako was severely injured and remained in a coma for several weeks.

The police obtained Yako's phone and traced the phone with which Yako had been communicating before the shooting to 15741 Littlefield, Detroit, Michigan (the Littlefield house). Two people associated with the Littlefield house, Billy Steele and Aye-Darius James, apparently noticed an undercover surveillance team on February 25, 2019, and approached the police officers.

-1-

Both men were detained, and the police seized the phone used to communicate with Yako from James. It is undisputed that the phone belonged to James. Recognizing that the surveillance had been compromised, Sergeant Ahmed Haidar chose to approach the house and knock on the side door. Defendant initially opened the door, but then quickly closed it upon seeing Sergeant Haidar outside. Sergeant Haidar believed defendant was the shooting suspect and, therefore, pursued defendant into the house to arrest him. After a preliminary protective sweep of the house to ensure no one else was present, the police obtained a search warrant. The warrant was executed the same day, but no evidence was discovered in the Littlefield house at that time.

Detective Gentry Shelby interviewed James the next day. James reported that he allowed defendant to use his phone at times and had seen defendant with a gun the day of the shooting. He did not know what happened to the gun thereafter, but thought defendant had been "caught with it." Detective Shelby inferred from James's statement that defendant was in possession of the gun on February 25, 2019, and that the police must have missed the gun when they searched the Littlefield house. Without procuring a new warrant, Sergeant Haidar and his team returned to the Littlefield house on February 27, 2019, and found a gun under the floorboards in the attic. A second search warrant was obtained later that day, and the gun was listed in the return for the second warrant. Expert testimony at trial linked the fired cartridge cases recovered from the scene of the shooting to the gun discovered in the Littlefield house.

## II. DISCUSSION

Defendant argues that the trial court erred by failing to suppress the fruits of the warrantless search performed on February 27, 2019. "This Court reviews de novo the application of constitutional standards regarding search and seizure and reviews for clear error the trial court's findings of fact supporting a motion to suppress." *People v Swenor*, 336 Mich App 550, 563; 971 NW2d 33 (2021). "A finding is clearly erroneous if, after reviewing the entire record, this Court is definitely and firmly convinced that the trial court made a mistake." *Id*. at 563-564.

## A. ABANDONMENT OF LITTLEFIELD HOUSE

The trial court's finding that the Littlefield house was abandoned was clearly erroneous.

Both the federal and Michigan constitutions preclude unreasonable searches and seizures. *People v Mahdi*, 317 Mich App 446, 457; 894 NW2d 732 (2016). See also *People v Mead*, 503 Mich 205, 212; 931 NW2d 557 (2019) (noting that the Michigan Constitution is "construed as coextensive with its federal counterpart"). In line with this restriction, "police officers generally must have a warrant to conduct a search." *Swenor*, 336 Mich App at 564-565. In the absence of a warrant, "the standard for determining constitutionality is whether the search was reasonable." *Id*. at 565.

Police do not need to obtain a warrant to search an abandoned house. See *People v Rasmussen*, 191 Mich App 721, 725; 478 NW2d 752 (1991). "Because there is no expectation of privacy in abandoned property, and because Fourth Amendment protections apply only when there is such an expectation of privacy, the defendant bears the burden of showing that the property searched was not abandoned." *People v Taylor*, 253 Mich App 399, 406; 655 NW2d 291 (2002)

(quotation marks and citation omitted). Determining whether property is abandoned depends on an examination of the totality of the circumstances. See *id*.

> With respect to abandoned or vacant structures, objective factors pertinent to the totality of the circumstances inquiry must be evaluated. Case by case, these factors will become relevant to determine whether police officers must secure a warrant before entering: (1) the outward appearance, (2) the overall condition, (3) the state of the vegetation on the premises, (4) barriers erected and securely fastened in all openings, (5) indications that the home is not being independently serviced with gas or electricity, (6) the lack of appliances, furniture, or other furnishings typically found in a dwelling house, (7) the length of time that it takes for temporary barriers to be replaced with functional doors and windows, (8) the history surrounding the premises and prior use, and (9) complaints of illicit activity occurring in the structure. Although the listed factors are not exhaustive or otherwise dispositive, a trial court must necessarily place them into the totality of the circumstances equation where a vacant structure is at issue. [*Id*. at 407.]

Other factors that have been considered by this Court's unpublished opinions include:[1] the presence of garbage and debris;[2] an inability to access portions of the home;[3] a pungent, unpleasant smell;[4] the presence of feces and urine;[5] use of an illegal electricity connection;[6] open entry doors;[7] and a lack of food or clothing.[8]

Application of these factors does not support the trial court's finding that the house was abandoned.[9] The exterior of the house in no way suggests that the house was abandoned. Based on what can be gleaned from the photographs, it seemed to be in decent, working condition. The windows and doors all appeared intact and nothing visible from the outside suggests that any of the windows or doors were not functional. Directly contrary to Sergeant Haidar's testimony, there

---

[1] Unpublished opinions of this Court are not binding, but may be considered for their persuasive value. *People v Kloosterman*, 296 Mich App 636, 641 n 2; 823 NW2d 134 (2012).

[2] *People v Lindsay*, unpublished per curiam opinion of the Court of Appeals, issued February 3, 2015 (Docket No. 318455), p 2.

[3] *Lindsay*, unpub op at 3; *People v Shaw*, unpublished per curiam opinion of the Court of Appeals, issued April 14, 2011 (Docket No. 296463), p 2.

[4] *Lindsay*, unpub op at 3.

[5] *Lindsay*, unpub op at 3. *Shaw*, unpub op at 2.

[6] *People v Lattimore*, unpublished per curiam opinion of the Court of Appeals, issued December 27, 2011 (Docket No. 298155), p 4; *Shaw*, unpub op at 2.

[7] *People v Harbin*, unpublished per curiam opinion of the Court of Appeals, issued March 9, 2010 (Docket No. 288381), p 2.

[8] *Harbin*, unpub op at 2.

[9] We have carefully reviewed the photographs that were taken of the house on February 27, 2019.

was no board on the front window. The two bushes in front of the porch appeared to be well-maintained, and also contrary to Sergeant Haidar's testimony, there were no signs of weeds. The gutters and downspouts appeared intact, and there was a garbage cart upright directly next to the side door. The lack of icicles suggests that the gutters were not clogged despite large trees surrounding the house. Snow had not been cleared off the front steps or any walkways, but it is common knowledge that snow shoveling is an often-neglected task. There was also a number plate and a mailbox affixed prominently to the front of the house. There were no barriers erected at any of the openings.

The photographs of the house's interior provide additional evidence that the house was occupied. First, while the house was messy, there is nothing in the photographs suggesting that it was particularly unclean. There was also no testimony suggesting that it was unclean, aside from general statements that the house was "ransacked." Moreover, in the photograph of the kitchen, a spray bottle of what appears to be a disinfectant or cleaner is clearly visible on the counter, and there was a vacuum cleaner in one of the bedrooms. Most of the mess in the house was clearly the result of the fact that the photographs were taken after the house had been searched twice; all of the cabinets were open, and all of the drawers had been removed. Unlike some of the unpublished opinions noted above, there was no testimony regarding an unpleasant smell and no signs of bodily waste. Officer Russell testified that there were no curtains, and while this was technically correct, the windows did all have blinds. The windows were all intact, there were no visible signs of damage on any walls, and the heat vents were all covered.

In addition to the cleaning supplies noted above, there were other signs that people had been living at the Littlefield house. A photograph of the living room shows a deck of cards on the floor. Another photograph of the living room shows a television, and the television appeared to be hooked up to something. There was no oven or refrigerator, but there was a microwave. The photographs showed a table that was overturned, a chair, and an air mattress that appeared to be fully inflated. There was conflicting evidence regarding utilities. Neither Sergeant Haidar nor Trooper Birmingham could remember if the house had electricity, but defendant testified that it did, and there was no indication that it was being serviced with electricity illegally. Sergeant Haidar testified that there was no furnace, but he did not mention that in any written reports, no photographs were taken in the basement, and defendant testified that there was a working furnace. Officer Russell testified that there was no running water, but defendant testified that there was. Defendant admitted that he would shower across the street, but he said this was because the shower head was not functional, but that situation was in the process of being remedied. Finally, we also note that there was no evidence regarding the house's history; there was no testimony suggesting that the police had been repeatedly called to the house, that the house had a reputation for playing host to drug deals or other criminal activity, or that there had been complaints of other sorts of illicit activities at the house.

The evidence also clearly shows that the failure of the police to obtain a warrant was not because they believed the house was abandoned. When asked why Sergeant Haidar did not get a warrant for the second search, he testified that he "thought the warrant was still fresh" because it had been issued within the past 48 hours. Sergeant Haidar testified that "usually the warrants say they are good for us for 48 hours, that that [sic] 48 hours didn't elapse at that point." Indeed, the police did a protective sweep of the house when they initially pursued defendant into it, and afterward they nevertheless felt it necessary to obtain a warrant. Nothing in the affidavit for the

initial search warrant made any reference to a belief that the house was abandoned, and the officers falsely listed the gun recovered in the warrantless search in the warrant return accompanying the second search warrant. It is clear from the record that the narrative that the house was abandoned was crafted afterward because the police realized they had made a mistake by searching the house a second time without a warrant. Even the trial court made comments taking issue with the conduct of the police:

> I do take issue with a search warrant being prepared after the officers have entered into a location, secured a weapon and then a search warrant is prepared indicating that, that weapon has been located and that weapon is then written as the return on the search warrant. I take great issue with that.
>
> The officer's testimony and I believe the officer when he indicated he believed it was vacant, and he was able to articulate why he believed it was vacant. Why at some point that officer was advised of the need to create a search warrant I think was misleading. I think it was, I think it was incredibly misleading and it just want [sic] an attempt to hide the fact that it appears at least to the prosecution at that point that the testimony was that he was advised, the testimony of the officer is he was advised to do the search warrant after the weapon was, was secured. *It was an attempt to really hide the fact that these officers went into this location without a search warrant*, and there was no reason to place that weapon on the search warrant return. [Emphasis added.]

For these reasons, we are firmly and definitely convinced that that trial court erred by finding that the house was abandoned.

## B. STANDING

The trial court failed to make adequate findings to facilitate review of its conclusion that defendant does not have standing to raise this Fourth Amendment violation.

"The right to be free from unreasonable searches and seizures is personal, and the right cannot be invoked by a third party." *Mahdi*, 317 Mich App at 458-459. Accordingly, an individual does not have standing to challenge a search unless the individual had a legitimate expectation of privacy in the location that was searched. *Id*. at 459. Defendant has the burden to establish standing, and the court must evaluate the totality of the circumstances. *Id*.

> Factors relevant to the determination of standing include ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. [*People v Brown*, 279 Mich App 116, 130; 755 NW2d 664 (2008) (quotation marks and citation omitted).]

"[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Minnesota v Carter*, 525 US 83, 90; 119 S Ct 469; 142 L Ed2d 373 (1998).

Because the court based its decision to deny defendant's motion to suppress on its erroneous finding that the house was abandoned, it did not fully consider whether defendant had a reasonable expectation of privacy in the Littlefield house. The trial court should do so on remand, and should clearly articulate its findings, based on the totality of the evidence, both from defendant's preliminary examination and the suppression hearing, as well as any additional evidence that may be admitted on remand.

In sum, while we are convinced that the police violated the Fourth Amendment by executing a warrantless search of the Littlefield house, the record is insufficient for us to ascertain whether defendant has standing to assert this violation. Therefore, additional development of the record is needed.

## III.  CONCLUSION

The trial court's finding that the Littlefield house was abandoned is reversed. This case is remanded for the limited purpose of ascertaining whether defendant has standing to assert a Fourth Amendment violation with respect to the warrantless search of the Littlefield house. Additional testimony may be presented to the extent that it is needed to supplement the record. On remand, if the court finds that defendant did have a legitimate expectation of privacy in the Littlefield house the court shall determine whether the erroneous admission of the fruits of the warrantless search warrants granting defendant a new trial. At this time, because resolution of this issue might prove decisive, we decline to review the other issue raised by defendant in this appeal. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Michael F. Gadola
/s/ Allie Greenleaf Maldonado