# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

               Plaintiff-Appellee,

v

THOMAS JOHN HOWARD,

               Defendant-Appellant.

UNPUBLISHED
February 13, 2018

No. 332337
Wayne Circuit Court
LC No. 15-007704-01-FC

Before: TALBOT, C.J., and METER and TUKEL, JJ.

PER CURIAM.

Defendant, Thomas John Howard, appeals as of right his convictions of assault with intent to commit murder, MCL 750.83, assault with intent to do great bodily harm less than murder, MCL 750.84, two counts of felonious assault, MCL 750.82, and two counts of assault and battery, MCL 750.81. The trial court sentenced Howard as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 25 to 40 years for the assault with intent to commit murder conviction, 6 to 10 years for assault with intent to do great bodily harm conviction, two to four years for each felonious assault conviction, and time served (93 days) for the assault and battery conviction. We affirm.

## I. FACTS AND PROCEEDINGS

Howard's convictions arise from an incident at a Clark gas station in Detroit on August 24, 2015. The two complainants, Darrick Jefferson and his uncle Desmond Thomas, rode their bicycles to the gas station around 10:00 p.m. While Jefferson and Thomas were outside the store entrance, Howard drove to the pump nearest the entrance in a blue Chevrolet Trailblazer. Howard's girlfriend, Wendy Alanis, was in the front passenger seat, and Alanis's nephew and niece were in the back seat. A verbal altercation occurred between Jefferson and Thomas and the occupants of the Trailblazer. There was no dispute at trial that Howard became involved in a physical confrontation with Jefferson, although the parties did dispute the circumstances of that altercation.

According to Jefferson and Thomas, Alanis looked at them in a hostile manner. When they asked her why, Howard accused them of "f***ing with" his wife. The argument escalated into a physical altercation in which Howard stabbed Jefferson several times with a knife. Thomas and Jefferson denied threatening Howard or his family. They testified that they tried to calm Howard down by suggesting that they could discuss the conflict.

-1-

Howard and Alanis denied that they started the confrontation. Howard testified that Thomas and Jefferson accused someone in the Trailblazer of saying something, and then demanded that this person get out of the vehicle. Howard said he tried to explain to them that there were no other adult males in the car, but they continued to demand that "the guy" get out. Howard and Alanis testified that they believed Thomas and Jefferson had guns because they had their hands concealed under their clothing. They suspected that Thomas and Jefferson intended to start trouble because Jefferson was wearing a heavy coat on a hot August night and Thomas was dressed entirely in black. Howard testified that he stabbed Jefferson in self-defense because Thomas had threatened his family and he believed Jefferson had a gun under his coat. Mark Hunt, an acquaintance of Howard, came from another vehicle and supported Howard by pushing and punching Thomas and Jefferson. Jefferson and Thomas eventually escaped on foot.

The incident was recorded on the gas station's surveillance camera. The video was played at trial, but did not include any sound. At trial, Jefferson and Thomas offered testimony narrating, explaining, and commenting on events depicted in the video. Howard's parole officer, Tamela Monday, also identified Howard and Hunt in the surveillance video for the purpose of establishing that they were associated with each other, but her status as Howard's parole officer was not disclosed to the jury.

## II. SUBSTITUTION OF COUNSEL

Defense counsel was originally retained by Howard's family, but was later appointed to represent Howard after Howard could not afford to pay the balance of counsel's fee. The record discloses that in November 2015, Howard wrote a letter to the court expressing his dissatisfaction with counsel. The trial court did not address this letter when it thereafter appointed counsel to represent Howard, nor did Howard object or express a desire for substitute counsel when the court decided to appoint the same attorney. However, Howard later wrote additional letters to the trial court and the chief judge expressing his dissatisfaction with counsel and requesting substitute counsel. The letters did not state any specific reasons for Howard's dissatisfaction, and Howard never expressed his dissatisfaction with counsel on the record at any court proceeding. Howard now argues that the trial court erred by failing to inquire into his complaints about counsel and failing to appoint substitute counsel.

We review a trial court's decision regarding substitution of counsel for an abuse of discretion.[1] "An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes."[2] To the extent this issue asserts a constitutional question, review is de novo.[3]

---

[1] *People v Traylor*, 245 Mich App 460, 462; 628 NW2d 120 (2001).

[2] *People v Daniels*, 311 Mich App 257, 265; 874 NW2d 732 (2015).

[3] *Id*.

The federal and state constitutions grant the right to counsel in all criminal prosecutions.[4] But while an indigent defendant is guaranteed the right to counsel, that right does not necessarily guarantee the defendant the attorney of his or her choice.[5] Thus, the trial court is not obliged to provide substitute counsel every time a dissatisfied defendant makes a request for new counsel.[6] Instead, a defendant is entitled to substitution of defense counsel only if discharge of the first attorney is for good cause and does not unreasonably disrupt the judicial process.[7] "Good cause may exist when a legitimate difference of opinion develops between a defendant and his appointed counsel as to a fundamental trial tactic, when there is a destruction of communication and a breakdown in the attorney-client relationship, or when counsel shows a lack of diligence or interest."[8] "A mere allegation that a defendant lacks confidence in his or her attorney, unsupported by a substantial reason, does not amount to adequate cause. Likewise, a defendant's general unhappiness with counsel's representation is insufficient."[9] Disagreements over "what evidence to present and what arguments to make[] are matters of trial strategy[] and . . . do not warrant appointment of substitute counsel."[10]

A trial court is obligated to inquire about the truth of a defendant's allegations that appointed counsel should be replaced.[11] Specifically, "the judge should hear [the defendant's] claim and, if there is a factual dispute, take testimony and state his findings and conclusions."[12] However, failure to do so does not necessarily warrant reversal of the defendant's conviction.[13] In *Ginther*, our Supreme Court concluded that the trial court's failure to explore the defendant's claims did not constitute grounds for reversal because "the record does not show that the lawyer assigned to represent [the defendant] was in fact inattentive to his responsibilities."[14] In *People v Buie (On Remand)*,[15] the defendant asked for substitute counsel "because trial counsel had yet to

---

[4] US Const, Am VI; Const 1963, art 1, § 20; *People v Marsack*, 231 Mich App 364, 372; 586 NW2d 234 (1998).

[5] *Traylor*, 245 Mich App at 462.

[6] *Id*.

[7] *Id*.

[8] *People v McFall*, 309 Mich App 377, 383; 873 NW2d 112 (2015) (quotation marks and citations omitted).

[9] *Id*. (quotation marks and citation omitted).

[10] *People v Strickland*, 293 Mich App 393, 398; 810 NW2d 660 (2011) (citations omitted).

[11] *People v Ginther*, 390 Mich 436, 441-442; 212 NW2d 922 (1973); *Strickland*, 293 Mich App at 397.

[12] *Ginther*, 390 Mich at 442.

[13] *Id*. at 442.

[14] *Id*. at 442.

[15] *People v Buie (On Remand)*, 298 Mich App 50, 69; 825 NW2d 361 (2012).

visit him in jail and because there had allegedly been a breakdown in his relationship with the public defender's office from the beginning." However, the trial court "did not consider the merits of defendant's claims in his pro per motion because counsel represented defendant."[16] This Court concluded that the trial court did not abuse its discretion in failing to appoint substitute counsel where defense counsel gathered necessary materials, prepared for trial, and realistically informed the defendant that his proposed insanity defense was frivolous. The attorney tried to maintain contact with the defendant, despite his frequent transfers to different detention facilities, but the defendant was not cooperative with inquiries from trial counsel's staff.[17]

In the instant case, the trial court never acknowledged Howard's written correspondence. Howard did not speak up at the hearing on January 11, 2016, although he might have done so when the trial court questioned him about his indigency affidavit and asset disclosure for the purpose of investigating his eligibility for appointed counsel. We agree that the trial court erred by failing to investigate Howard's complaints. However, the record does not support Howard's argument that the trial court's disregard of Howard's requests requires reversal. Howard's letters raised general complaints that counsel was inattentive to his case, but did not state that there were any disagreements regarding trial fundamental tactics or other facts establishing good cause. Howard complained in his letter to the chief judge that counsel did not object when the trial court stated that it had already decided that Howard was guilty. However, the statement in question was made in the context of the trial court's review of a motion to quash and Howard's letter reflects that he did not understand the legal context of such a motion. Likewise, on appeal, Howard has not stated any specific facts concerning disagreement with defense counsel.

Having reviewed the record concerning defense counsel's performance, it is evident that counsel was familiar with the facts of the case and diligent in his defense of his client. Counsel moved to exclude Thomas's and Jefferson's comments regarding the video recording. He moved to exclude photographs of Jefferson's injuries, Monday's testimony, and recordings of Howard's jail telephone calls. He extensively cross-examined prosecution witnesses, including Jefferson and Thomas. His cross-examination of prosecution witnesses reflects his familiarity with weaknesses in their testimony, for example Jefferson's misidentifications in the photographic lineups. Counsel attempted to present a self-defense theory. Howard does not identify any evidence or tactics that defense counsel should have offered to his advantage. Accordingly, Howard has failed to establish a violation of his constitutional right to counsel.

### III. SURVEILLANCE VIDEO

Howard argues that the witnesses' testimony describing the contents of the surveillance video was improper because it invaded the province of the jury to view the video and make its own determinations regarding the contents. The trial court's evidentiary rulings are reviewed for

---

[16] *Id*. at 69.

[17] *Id*. at 69-70.

an abuse of discretion.[18] An abuse of discretion occurs when the trial court chooses an outcome that is outside the range of principled outcomes.[19] "Preliminary issues of law, including the interpretation of the rules of evidence and the effect of constitutional provisions, are reviewed de novo."[20] A preserved, constitutional error is harmless if the record establishes "beyond a reasonable doubt that there is no reasonable possibility that the [error] complained of might have contributed to the conviction."[21]

Howard argues that the prosecutor's and the trial court's direct questions to Thomas and Jefferson regarding what they saw in the video, and regarding the identification of persons in the video, exceeded the limits of permissible opinion testimony allowed by MRE 701. Howard also argues that it was improper for the prosecutor to pose similar questions to Monday, and to defense witnesses on cross-examination. Additionally, Howard contends that the trial court's questions violated the rule that "[a] witness may not opine about the defendant's guilt or innocence in a criminal case."[22] We disagree.

MRE 701 permits lay testimony in the form of opinions or inferences if the testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." In *People v Fomby*,[23] the defendant argued that the testimony of Sergeant Ron Gibson, a certified video forensic technician, constituted improper lay opinion testimony. Gibson testified that individuals depicted in still-frame photos produced from a surveillance video were the same individuals depicted in the actual video.[24] This Court concluded that Gibson's testimony was admissible under MRE 701 and observed that "Gibson's testimony was rationally based on his perception."[25] Although Gibson was not at the scene when the video was recorded, he watched the video, produced short clips of the individuals, and isolated frames to create still images.[26] Additionally, "Gibson's testimony was intended to provide a clearer understanding about whether the two suspects depicted in the video had been to the [crime scene] earlier in the evening, a fact at issue in the case."[27] Citing *United States v LaPierre*,[28] this

---

[18] *People v Taylor*, 252 Mich App 519, 521; 652 NW2d 526 (2002).

[19] *Daniels*, 311 Mich App at 265.

[20] *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011).

[21] *People v Mahdi*, 317 Mich App 446, 471-472; 894 NW2d 732 (2016) (quotation marks and citation omitted).

[22] *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012).

[23] *People v Fomby*, 300 Mich App 46, 48; 831 NW2d 887 (2013).

[24] *Id*. at 49.

[25] *Id*. at 50.

[26] *Id*. at 50-51.

[27] *Id*. at 51.

Court distinguished Gibson's testimony from the objectionable testimony in *LaPierre* on the ground that Gibson did not identify the defendant as the individual in the video or still frames.[29] Instead, Gibson "only linked individuals depicted in the surveillance video as being the same individuals depicted in the still photographs."[30] Gibson did not express an opinion as to the defendant's guilt. He only compared still images that he personally created from the video to images in the video.[31]

Howard relies on *People v Perkins*.[32] In *Perkins*, the defendant Kenya Hyatt argued that police officer Terence Green, "invaded the province of the jury by offering his opinion that certain video footage and still frames from the stairwell of the apartment building where the murder occurred were of Hyatt."[33] The prosecutor asked Green, "[C]an you tell us who is coming down these stairs when you can see them?" Green identified the person as the defendant, Kenya Hyatt.[34] Green further testified: "[A]s Hyatt neared the bottom of the stairs, 'you can clearly see him make a motion. Left hand crosses the body. Right hand touches the hip,' which Green believed was an attempt to conceal a weapon."[35] Citing MRE 701 and *Fomby*, this Court held that Green's testimony "invaded the province of the jury" because "Green affirmatively identified Hyatt as the individual in the stairwell."[36] This Court contrasted Green's testimony from "the witness in *Fomby* who testified that the individual in the video footage was the same individual in still images but did not specifically identify the defendant as the individual in the images . . . ."[37] This Court explained:

> Green could properly comment that, based on his experience, the individual appeared to be concealing a weapon, but Green should not have been allowed to identify Hyatt as that individual. "[W]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v Drossart*, 99 Mich App 66, 80; 297 NW2d 863 (1980). There was nothing about the images (i.e. poor quality of the images, defendant wearing

---

[28] *United States v LaPierre*, 998 F2d 1460 (CA 9, 1993).

[29] *Fomby*, 300 Mich App at 52-53.

[30] *Id*. at 53.

[31] *Id*.

[32] *People v Perkins*, 314 Mich App 140; 885 NW2d 900 (2016), vacated in part on other grounds sub nom *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016).

[33] *Perkins*, 314 Mich App at 160.

[34] *Id*.

[35] *Id*. at 161.

[36] *Id*.

[37] *Id*.

a disguise) that necessitated Green's opinion. This is evidenced by the trial court's own statement during defense counsel's objection that "I would have no trouble making an identification myself."[38]

This Court held, however, that the error was harmless in light of the overwhelming evidence of Hyatt's guilt and the fact that Hyatt's identity was not reasonably in dispute.[39] Because Hyatt's identity was not at issue, this Court concluded that "Green's testimony was ultimately of no consequences."[40]

The testimony of Jefferson and Thomas is of a different character than the testimony involved in these cases. Jefferson and Thomas had personal knowledge of the events depicted in the video because they were present when the events occurred and they themselves were depicted in the video. They did not interpret the video for the jury. Rather, they identified themselves, Howard, and Hunt based on their own presence at the scene of the events depicted. When Thomas and Jefferson were asked about what was happening in the video, they were not explaining events that they, like the jury, had not previously seen. They merely used the video to complement their testimony explaining the events they participated in. Although the video recording is reasonably clear, it does not plainly depict what Howard is holding when he made stabbing motions toward Jefferson. Importantly, Jefferson's and Thomas's testimony that Howard was armed with a knife was not based on opinions they formed from viewing the video, but was rationally based on their own perceptions during the offense, and their testimony was helpful to the jurors' understanding of what they saw in the video. In context, the video recording served to corroborate and illustrate their testimony that Howard and Hunt committed unprovoked assaults. "Photographs may . . . be used to corroborate a witness' testimony."[41] Similarly, the trial court's questions to Thomas, Jefferson, and Alanis in reference to the video also were not improper because they merely sought to have the witnesses clarify what was happening in the video based on their own presence and participation in the events depicted therein.

We acknowledge that Jefferson, Thomas, and Monday identified Howard in the video. However, Jefferson and Thomas had already identified Howard as their assailant before the video played, and they were in a superior position to make that identification because of their participation in the events depicted. Monday's testimony identifying Howard is more problematic, as she was not present at the scene and there was no evidence presented establishing

---

[38] *Id*. at 161-162.

[39] *Id*. at 162-163. Hyatt confessed that he helped plan the robbery, that he carried a gun, and that he shot the victim. *Id*.

[40] *Id*. at 163.

[41] *People v Gayheart*, 285 Mich App 202, 227; 776 NW2d 330 (2009) (quotation marks and citation omitted).

her superior ability to identify Howard.[42]  However, Howard's identity was not disputed. Defense counsel began his opening remarks by stating that Howard went to the gas station to purchase gas.  Howard and his girlfriend did not dispute that Howard was the person involved in the altercation, though they blamed Thomas and Jefferson for inciting the incident by threatening Howard and his family.  Howard, Alanis, and her nephew and niece all acknowledged that Howard was the person depicted in the video recording.  Accordingly, to the extent that Monday's identification testimony might have been erroneously admitted, the error was harmless beyond a reasonable doubt.[43]

## IV.  JUDICIAL IMPARTIALITY

Howard next argues that the trial court's comments and conduct throughout the trial pierced the veil of judicial impartiality and denied him a fair trial.  Because Howard did not object to the trial court's conduct or questions at trial, this issue is unpreserved.[44]  Whether judicial misconduct resulted in the denial of a fair trial is a question of constitutional law and, thus, subject to de novo review.[45]  However, unpreserved issues are reviewed for plain error affecting substantial rights.[46]  An error is plain if it is clear or obvious, and an error affects substantial rights if it is prejudicial, i.e., if it affects the outcome of the proceeding.[47]

"A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality."[48]  Our Supreme Court stated in *Stevens*,

> A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality.  A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a

---

[42] However, we note that when Howard raised his pretrial objection to Monday's testimony, he did not argue that Monday's identification would improperly invade the province of the jury. Instead, he argued that Monday's identification testimony was unnecessary and that it would be more prejudicial than probative for her to testify that she was familiar with Howard because she was his parole officer.  Howard did not further object after the prosecutor stated that Monday would not be identified as such.  Monday's familiarity with Howard would likely have provided an adequate foundation to qualify her to make the identification.

[43] *Mahdi*, 317 Mich App at 471-472; *Perkins*, 314 Mich App at 162-163.

[44] *People v Sardy*, 216 Mich App 111, 117-118; 549 NW2d 23 (1996).

[45] *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

[46] *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

[47] *Id*. at 763.

[48] *People v Johnson*, 315 Mich App 163, 196; 889 NW2d 513 (2016) (quotation marks and citation omitted).

party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial.[49]

In determining whether a judge's conduct pierced the veil of judicial impartiality and denied the defendant a fair trial, a fact-specific analysis is required.[50] "Judicial misconduct may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions."[51] "A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality."[52] "[T]he reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors."[53]

Howard argues that the trial court displayed partiality in favor of the prosecutor by examining witnesses with the purpose of strengthening the prosecutor's case and undermining the defense theory. The record does not support this argument. "The court may interrogate witnesses, whether called by itself or by a party."[54] A trial judge's questioning of witnesses "is generally appropriate under MRE 614(b)."[55] However, "[w]hile a trial court may question witnesses to clarify testimony or elicit additional relevant information, the trial court must exercise caution and restraint to ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial."[56] A judge may "not permit his own views on disputed issues of fact to become apparent to the jury."[57] "Because jurors look to the judge for guidance and instruction, they are very prone to follow the slightest indication of bias or prejudice upon the part of the trial judge."[58] Nonetheless, improper comment by the judge can often be resolved by providing the jury "with general curative instructions to the effect that [the trial judge's]

---

[49] *Stevens*, 498 Mich at 164.

[50] *Id*. at 171.

[51] *Id*. at 172-173.

[52] *Id*. at 171.

[53] *Id*. at 171-172.

[54] MRE 614(b).

[55] *Stevens*, 498 Mich at 173.

[56] *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996).

[57] *Stevens*, 498 Mich at 174 (quotation marks and citation omitted).

[58] *Id*. (quotation marks and citation omitted).

questions and comments were not evidence, any judicial intervention was not meant to reflect a personal opinion, and the jury could only decide the case on the basis of the evidence."[59] "It is well established that jurors are presumed to follow their instructions."[60] Yet, when prejudicial judicial questioning of one party is "excessive and imbalanced," "a single, general instruction may not alleviate substantial judicial bias . . . ."[61]

Howard argues that the trial court's lengthy questioning of Jefferson in conjunction with review of the video recording overstepped the bounds of judicial impartiality. He contends that the court's questions went beyond clarifying factual issues, which were not complex, and that the questioning was unnecessary because the attorneys had already extensively questioned Jefferson on direct examination and cross-examination. Howard also complains that the trial court asked several leading questions. He asserts that the trial court's questioning essentially conveyed its own perception of the surveillance video and sought Jefferson's agreement by ending questions with the phrases "is that right?" or "is that true?" Howard also contends that the sheer number of the questions posed by the court demonstrated partiality.

Howard accurately states that the trial court made comments about the events depicted in the video and asked Jefferson if its comments were correct. In the context of Jefferson's examination, these were not leading questions in which the trial court made and asserted facts to be rubber-stamped by Jefferson. The trial court made statements about events in the video that were plainly apparent to anyone watching the video and to which Jefferson had already testified. The court also asked Jefferson what he, Thomas, and Howard had said at nearly every point depicted in the video. The court's lengthy questioning served to correlate the words spoken by the participants, as explained through testimony, with the visual depiction of their conduct, as shown through the video, which was helpful to the jury's determination of whether Jefferson and Thomas said or did anything to provoke, justify, or excuse Howard's conduct.

The trial judge also questioned Thomas and Jefferson about matters that neither attorney had addressed in their examinations. These questions were not aimed at supporting one side over the other. Indeed, several of the questions elicited testimony helpful to the defense. For example, the trial court asked Jefferson why he and Thomas left their bicycles in front of the gas station door, so that customers would have to step over or around the bicycles to get inside. Jefferson replied that he intended "to go right in there and come right back out." The trial court's attention to the location of the bicycles was potentially helpful to Howard's theory that Jefferson and Thomas were behaving antagonistically and looking for a fight. The trial court also asked Jefferson if he lunged at Howard of if someone pushed him. Jefferson replied that Hunt punched him in the back of the head, causing him to move toward Howard. The trial court's attention to Jefferson's sudden movement toward Howard was consistent with Howard's theory that he believed Jefferson was attacking him. The trial court also elicited testimony from Jefferson indicating that he did not know the person who took one of the bicycles after the

---

[59] *Id*. at 190.

[60] *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

[61] *Stevens*, 498 Mich at 190.

incident. Jefferson's answer negated any inference that Howard was responsible for the subsequent theft.

Howard argues that the trial court's examination of Alanis revealed that it disbelieved Howard's self-defense theory. For instance, the court asked, "There was not anything preventing Mr. Howard and you from getting into the Trailblazer and leaving, was there?" Alanis admitted that there was not. Howard argues that the phrasing of these questions suggested that the trial court believed that Howard could have peacefully retreated from the altercation. A judge may not intentionally or unintentionally exhibit disbelief of a witness or otherwise "permit his own views on disputed issues of fact to become apparent to the jury."[62] However, the totality of the trial court's questioning and conduct did not convey partiality. The Self Defense Act (SDA), MCL 780.971 *et seq.*, does not impose a duty to retreat on a person who is not engaged in the commission of a crime and who has a legal right to be at the location.[63] The SDA "altered the common law of self-defense concerning the duty to retreat" and "created a new substantive right, i.e., the right to stand one's ground and not retreat before using deadly force in certain circumstances in which a duty to retreat would have existed at common law."[64] This modification of the common law also applies when a defendant uses nondeadly force.[65] Consequently, although the trial court's suggestion tended to place Howard in an adverse light, it did not directly undermine the self-defense theory because there was no duty to retreat. If Howard had raised a timely objection, the trial court could have resolved any perceived prejudice by instructing the jury that Howard did not have a duty to retreat.[66] Even without an objection, the trial court properly instructed the jury on self-defense, including duty to retreat. The court instructed the jury as follows:

> A person can use deadly force in self-defense only where it is necessary to do so. If the defendant could have safely retreated but did not do so, you may consider that fact in deciding whether the defendant honestly and reasonably believed he needed to use deadly force in self-defense. However, a person is never required to retreat if the person reasonably believes that an attacker is about to use a deadly weapon, nor if the person is subject to a sudden fierce and violent attack. *Further, a person is not required to retreat if the person has not or is not engaged in the commission of a crime at the time the deadly force is used and has a legal right to be where the person is at that time* and has an honest and reasonable belief that the use of deadly force is necessary to prevent imminent death and/or great bodily harm of the person. [Emphasis added.]

---

[62] *Stevens*, 498 Mich at 174 (quotation marks and citation omitted).

[63] MCL 780.972.

[64] *People v Conyer*, 281 Mich App 526, 530; 762 NW2d 198 (2008).

[65] MCL 780.972(2).

[66] *Stevens*, 498 Mich at 190.

Furthermore, to the extent that the trial court's questions could be perceived as conveying skepticism as to defense witnesses' credibility, the court adequately addressed this concern by providing the following instruction to the jury:

> It is my duty to see that the trial is conducted according to the law and to tell you the law that applies to this case. However, when I make a comment or give an instruction, I am not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion. You are the only judges of the facts, and you should decide this case from the evidence.

Because Howard has not established that the court's questioning of witnesses was excessive or imbalanced, this instruction was sufficient to remedy any perceived prejudice.[67]

The trial court asked Howard questions about his motives at the beginning of the altercation with Jefferson and Thomas. For example, the court asked, "[i]nstead of pumping the gas, you then approached these African-American males, is that true?" and "If all . . . you wanted to do was to get your gas, why didn't you just go to the pump . . . take the hose out and put it into the back end of your car?" These questions gave Howard an opportunity to reconcile aspects of his testimony that conflicted with the events in the video recording. Howard said he got out of the car to pump gas, but instead he approached Thomas and Jefferson. He also explained that he believed Thomas and Jefferson were threatening him and that they might shoot at the vehicle if it drove away. The trial court's questions were properly designed to clarify the explanations that Howard had offered for his actions. It was Howard's answers, not the trial court's questions, which hindered his defense.

Howard also cites instances during trial in which the trial judge expressed impatience or annoyance with defense counsel. However, the record also discloses that the trial court expressed similar impatience or annoyance with the prosecutor and with witnesses. Collectively, these expressions of annoyance and impatience were balanced and do not reflect that the court was partial to the prosecutor.

Considering the totality of the circumstances, Howard has failed to establish that the trial court's conduct pierced the veil of judicial impartiality. Furthermore, Howard has not demonstrated that the court's conduct affected his substantial rights because the court's jury instructions were sufficient to advise the jury that the court's questions and comments were not intended to express a personal opinion about the case, that the jury should disregard any perceived opinion by the court about how the case should be decided, and that the jury was the only judge of the facts.

---

[67] *Stevens*, 498 Mich at 190; *Graves*, 458 Mich at 486.

## V. PHOTOGRAPHS

Howard argues that the trial court abused its discretion by failing to exclude photographs of Jefferson's injuries, especially considering that it did not view the photos to determine their potential for unfair prejudice before ruling that they were admissible. We review a trial court's decision to admit or exclude evidence for an abuse of discretion.[68] An abuse of discretion occurs when the trial court chooses an outcome that is outside the range of principled outcomes.[69]

"If photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they vividly portray the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors."[70] Although photos may be excluded under MRE 403 if they are unfairly prejudicial, photographs are not excludable simply because a witness can orally testify about the same information.[71] Conversely, photos should be excluded if they depict the gruesome nature of a crime and are not pertinent, relevant, or material to any issue in the case, and thus serve only to inflame the jurors' minds and prejudice them against the defendant.[72] "The proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice."[73]

The photos introduced as People's Exhibit Nos. 6 through 9 are close up images of Jefferson's trunk. The most notable aspect of these photos is the presence of bandages. As we have observed before, photos that depict injuries in a clinical manner are generally not objectionable.[74] Exhibit Nos. 10 and 11 more clearly depict the body of a man who has sustained substantial trauma, but the overall impression of the photographs is neither shocking nor gruesome. The photographs were relevant to show the injuries Howard inflicted on Jefferson. The nature, number, and location of the injuries were probative of Howard's intent during the attack. Moreover, considering the clinical nature of the photographs, there was little danger of arousing the jury's passions. Therefore, the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. Although the trial court erred by failing to conduct a proper balancing test under MRE 403 before deeming the photos admissible, we will not reverse a correct decision reached for the wrong reason.[75]

---

[68] *Taylor*, 252 Mich App at 521.

[69] *Daniels*, 311 Mich App at 265.

[70] *People v Hoffman*, 205 Mich App 1, 18; 518 NW2d 817 (1994).

[71] *People v Mills*, 450 Mich 61, 76; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

[72] *Mills*, 450 Mich at 77.

[73] *Id*. at 76. See also MRE 403.

[74] See, e.g., *Hoffman*, 205 Mich App at 19.

[75] *People v McLaughlin*, 258 Mich App 635, 652 n 7; 672 NW2d 860 (2003).

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Howard raises four claims of ineffective assistance of counsel. Because Howard did not raise this issue in a motion for a new trial or request for a *Ginther* hearing in the trial court, our review of Howard's claims is "limited to mistakes apparent on the lower court record."[76] "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law."[77] To establish ineffective assistance of counsel, a defendant must show that "(1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the defendant's trial could have been different."[78]

First, the record does not support Howard's claim that defense counsel violated MRPC 1.16(a)(3) by continuing to represent him after being discharged. There is no evidence that defense counsel was ever discharged or withdrew from representing Howard. In a letter to the court, Howard asked for permission to "absolve" counsel of his representation but made no reference to having discharged counsel, who was retained at the time. When the court later determined that Howard was indigent for purposes of entitlement to court-appointed counsel, counsel expressly informed the court that he was not asking to withdraw as counsel. Nonetheless, the court selected the same attorney to serve as appointed counsel, without objection from Howard.

Howard next argues that trial counsel was ineffective for failing to object to the prosecutor's and trial court's extensive use of leading questions. Howard argues that trial counsel should have objected pursuant to MRE 611(d)(1), which states that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Howard does not cite specific leading questions, but incorporates his argument regarding the video surveillance testimony. As explained earlier, the prosecutor's and trial judge's main focus in questioning Jefferson and Thomas regarding the video was to correlate their statements during the altercation with their conduct depicted in the video. The leading portion of the questions was not to ascertain information, but to reference specific moments in the altercation that were already the subject of testimony and were depicted in the video. Considering this context, trial counsel's failure to object was neither an objectively unreasonable error, nor an outcome-determinative omission.[79]

Howard next argues that trial counsel was ineffective for failing to object to the trial court's questions and comments. As discussed earlier, the only potentially problematic question involved the trial court's suggestion to Alanis that there was no reason why Howard could not have driven away instead of engaging with Jefferson and Thomas. Had defense counsel

---

[76] *People v Solloway*, 316 Mich App 174, 188; 891 NW2d 255 (2016).

[77] *Id*. at 187.

[78] *Id*. at 188.

[79] *Id*.

objected, the trial court could have issued a specific curative instruction to alleviate any potential prejudice. As previously explained, however, considering the totality of the circumstances, the trial court's later instructions regarding the respective roles of the court and jury, as well as the law applicable to Howard's claim of self-defense, was sufficient to cure any perceived prejudice. Therefore, Howard was not prejudiced by counsel's failure to object.

Howard also argues that trial counsel was ineffective for not requesting a missing witness instruction with respect to Habib Al-Alladai and Ahmed Alisa. The prosecutor filed a witness list identifying Al-Alladai and Alisa as potential witnesses, but did not designate either witness as one the prosecutor intended to call at trial. However, with regard to a witness who is not endorsed by the prosecution, MCL 767.40a(5) requires that the prosecution provide "reasonable assistance" to a defendant in locating and serving process, if the defendant requests such assistance not less than 10 days before trial.[80] If the prosecutor fails to provide the requisite reasonable assistance, "it might be appropriate to instruct a jury that the missing witness would have been unfavorable to the prosecution."[81] If the appearance of a witness was the responsibility of the prosecution, the missing witness jury instruction allows the jury to infer that the witness's testimony would have been unfavorable to the prosecution's case.[82]

There is no factual support for Howard's position that the prosecution failed in its duty under MCL 767.40a(5). As already noted, the prosecutor identified Al-Alladai and Alisa as potential witnesses, but did not endorse them as witnesses the prosecutor intended to call at trial. Therefore, a missing witness instruction would have been appropriate only if Howard had requested reasonable assistance in locating and producing the witnesses for trial, and the prosecution failed to provide reasonable assistance. The prosecutor acknowledged that Howard requested assistance in locating and serving these witnesses with process, but explained that they were unavailable and that Detective Lillie Drake could testify as to her attempts to locate them. But when Detective Drake testified at trial, Howard did not question her regarding her efforts to find and produce Al-Alladai or Alisa, and Howard has not attempted to supplement the record posttrial. Therefore, Howard has not established the factual predicate for his claim that a missing witness instruction would have been appropriate. Furthermore, there is no indication in the record that either of these witnesses had any knowledge of any matter relevant to the issues at trial. Accordingly, Howard has not shown that he was prejudiced by counsel's failure to request a missing witness instruction.

## VII. PROSECUTOR'S FAILURE TO PRODUCE WITNESSES

Howard raises an independent claim that the prosecutor violated MCL 767.40a(5) by failing to provide reasonable assistance to locate and serve Al-Alladai or Alisa. Howard's failure to raise this issue in the trial court precludes appellate relief unless Howard establishes a plain

---

[80] *People v Koonce*, 466 Mich 515, 521; 648 NW2d 153 (2002), citing MCL 767.40a(5).

[81] *People v Perez*, 469 Mich 415, 420; 670 NW2d 655 (2003).

[82] See M Crim JI 5.12.

error affecting his substantial rights.[83] An error is plain if it is clear or obvious.[84] As explained previously, there is no record evidence supporting Howard's claim that the prosecutor failed to provide reasonable assistance in locating and serving these witnesses in advance of trial. Without such evidence, Howard is unable to establish a clear or obvious error. Accordingly, he is not entitled to relief.

## VIII. CUMULATIVE ERROR

Lastly, Howard argues that if no individual error is sufficient to warrant reversal of his convictions, he should be granted a new trial based on the cumulative effect of multiple errors.

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted."[85] "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal."[86] To the extent that Monday's identification testimony was erroneously admitted, the error was harmless beyond a reasonable doubt because Howard's identification was not a disputed issue in the case. To the extent that the trial court's questioning of Alanis, standing alone, could be construed as skepticism of the defense theory, any perceived prejudice was cured by the court's jury instructions. Howard has failed to establish any other errors. Accordingly, Howard has failed to establish that the cumulative effect of several errors denied him a fair trial.

Affirmed.

/s/ Michael J. Talbot
/s/ Patrick M. Meter
/s/ Jonathan Tukel

---

[83] *Carines*, 460 Mich at 763-764.

[84] *Id*. at 763.

[85] *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007).

[86] *Id*.