# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MICHAEL BRIAN MCJUNKIN,

Defendant-Appellant.

UNPUBLISHED
August 28, 2018

No. 338400
Calhoun Circuit Court
LC No. 2016-001379-FH

Before: MURPHY, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

A jury convicted Michael Brian McJunkin of one count of operating or maintaining a methamphetamine laboratory under MCL 333.7401c(1)(c) and (2)(f). He was sentenced as a fourth-offense habitual offender, MCL 769.12, to 20 to 40 years' imprisonment. McJunkin now appeals as of right. We affirm.

## I. BACKGROUND

This case arises from McJunkin's involvement in the manufacturing of methamphetamine. On the evening of August 14, 2015, police officers Zachary Burgess, Michael Ziegler, and Brandon Huggett responded to a report of suspicious activity at a home that was later determined to be the residence of Craig Wightman. According to Wightman's neighbor, a green Ford Explorer had pulled into Wightman's detached garage, drapes were drawn over the garage windows, and an odd smell became apparent shortly thereafter. While approaching the garage on foot, the officers detected a strong odor of ammonia, which indicated to the officers that there may have been an active, one-pot methamphetamine laboratory within the garage.

When the officers were about 10 feet away from the garage, Wightman left the garage through a side door, leaving that door open behind him. The officers detained Wightman and looked through the door, spotting two people: Justin McCowen—who was standing in front of a dryer—and McJunkin—who was sitting in the driver's seat of the Explorer with the driver's door open. Both McCowen and McJunkin were ordered out of the garage and detained. Wightman gave Officer Huggett consent to search the garage.

During his search of the garage, Officer Burgess came across a one-pot methamphetamine laboratory inside of a water bottle, located on top of the dryer, and a backpack

-1-

containing the materials necessary for manufacturing methamphetamine. Within the Explorer, Officer Burgess found McJunkin's identification card on the driver's seat, and, in the driver-side cup holder, he discovered several folded coffee filters that contained crushed pseudoephedrine tablets—a primary component in the manufacturing of methamphetamine.

Wightman testified as a witness for the prosecution. Although two defense witnesses testified that Wightman had assured them before the trial that McJunkin had nothing to do with the methamphetamine activity, Wightman testified differently. According to Wightman, he, McCowen, and McJunkin met on August 14, 2015, and hatched a plan to manufacture methamphetamine. The three agreed that Wightman and McCowen would purchase pseudoephedrine and Wightman left to go to the pharmacy. Approximately 20 to 30 minutes after completing the purchase and returning home, he was joined by McJunkin and McCowen. Wightman believed that McJunkin drove the Explorer. McJunkin stayed in the vehicle for 10 to 15 minutes after arriving, listening to music, until Wightman went into his house to take a shower while McJunkin and McCowen remained in the garage to make preparations to manufacture the methamphetamine. At this point, however, police arrived at Wightman's garage and detained the three men.

## II. SEARCH AND SEIZURE

McJunkin first argues that the search of the Explorer and seizure of the pseudoephedrine found therein violated his Fourth Amendment right to be free from unreasonable searches and seizures. We disagree.

"A trial court's findings on a motion to suppress evidence as illegally seized will not be reversed on appeal unless clearly erroneous, while questions of law and the decision on the motion are reviewed de novo." *People v Waclawski*, 286 Mich App 634, 693; 780 NW2d 321 (2009) (citations omitted). A finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake was made. *Id*.

Before trial, McJunkin moved to suppress the evidence seized from the Explorer, arguing that the search of the Explorer was an unreasonable, warrantless search conducted without the consent of the vehicle's owner. The prosecution disagreed and asserted that Wightman, who resided on the property, gave valid consent to search the garage which extended to the vehicle inside the garage. The trial court denied the motion to suppress on the basis that McJunkin lacked standing to challenge the search because he was neither the homeowner nor the owner of the Explorer. The court also noted that the police acted in reasonable reliance upon the consent obtained from Wightman and McCowen.[1]

---

[1] We note that the record does not support the suggestion that the officers obtained consent to search the Explorer from McCowen. Although McJunkin's written motion averred that McCowen consented to the search, neither party offered evidence in support of that fact, and counsel acknowledged as much at oral argument. Therefore, to the extent that the trial court based its ruling, in part, upon McCowen's alleged consent, it clearly erred in doing so.

The Fourth Amendment guarantees every person the right to be free from unreasonable searches and seizures. *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011). However, a person must have standing to challenge the reasonableness of a search. See *People v Mahdi*, 317 Mich App 446, 458-459; 894 NW2d 732 (2016). To assert standing, "the individual must have had a legitimate expectation of privacy in the place or location searched, which expectation society recognizes as reasonable." *Id*. at 459 (quotation marks and citation omitted). The defendant bears the burden of establishing standing, which is determined by analyzing the totality of the circumstances. *Id*. Factors relevant to this analysis include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. [*Id*. (quotation marks and citation omitted).]

McJunkin, though not the owner of the Explorer, drove it on the date in question. McJunkin's driver's license was discovered on the driver's seat, and it was suggested at trial that the vehicle belonged to his girlfriend. Apart from these basic facts, the record is devoid of other information concerning the nature of McJunkin's use of the vehicle. We question the wisdom of the trial court's decision to rule on the issue of standing without further factual development. However, we find it unnecessary to determine if McJunkin had standing to challenge the search because, assuming he did have standing, the search was reasonable and did not violate the protections afforded by the Fourth Amendment.

"The basic rule is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *People v Earl*, 297 Mich App 104, 107; 822 NW2d 271 (2012), aff'd 495 Mich 33 (2014), quoting *Arizona v Gant*, 556 US 332, 338; 129 S Ct 1710; 173 L Ed 2d 485 (2009). One such exception is for searches conducted pursuant to unequivocal and specific consent that is freely and intelligently given. *Mahdi*, 317 Mich App at 460. The scope of consent is considered under an objective reasonableness standard, considering what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Id*. at 461 (quotation marks and citation omitted). In addition, under the plain-view exception, police officers may seize evidence "in plain view if the officer is lawfully in the position to have that view and the evidence is obviously incriminatory." *People v Galloway*, 259 Mich App 634, 639; 675 NW2d 883 (2003).

Here, it is undisputed that Wightman, the resident of the property, gave the officers consent to search the garage, and there is no indication that Wightman limited the scope of his

consent in any manner.[2]  Accordingly, the police officers' entry into the garage and search thereof was reasonable and does not implicate the Fourth Amendment protections. *Mahdi*, 317 Mich App at 460-461. Once inside the garage, the officers observed an active, one-pot methamphetamine laboratory on the dryer and coffee filters near the Explorer.  The driver-side door was open and additional folded up coffee filters were located in the driver-side cup holder. Given the strong odor of ammonia in the garage, the presence of an active, one-pot methamphetamine laboratory, and the officers' understanding that coffee filters are commonly used in manufacturing methamphetamine, the coffee filters in the Explorer could be viewed as obviously incriminatory. Upon closer inspection the filters appeared to contain crushed pseudoephedrine, another item necessary for methamphetamine production.  Under these circumstances, the police officers were able to seize the pseudoephedrine under the plain-view exception. *Galloway*, 259 Mich App at 639.

## III. SUFFICIENCY OF THE EVIDENCE

Next, McJunkin argues that there was insufficient evidence to convict him of operating or maintaining a methamphetamine laboratory.  We disagree.

For sufficiency of the evidence claims, this Court "must view the evidence in a light most favorable to the prosecution . . . ." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).  The trier of fact, not this Court, determines the inferences that may be drawn from the evidence and the weight assigned to those inferences. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).  "This Court will not interfere with the jury's role of determining the weight of the evidence or deciding the credibility of the witnesses." *People v Fletcher*, 260 Mich App 531, 561; 679 NW2d 127 (2004).

McJunkin was charged with operating or maintaining a methamphetamine laboratory under MCL 333.7401c(1)(c), which prohibits a person from "[p]rovid[ing] any chemical or laboratory equipment to another person knowing or having reason to know that the other person intends to use that chemical or laboratory equipment for the purpose of manufacturing a

---

[2] Indeed, the lack of restriction on the scope of Wightman's consent could form an alternative basis for the legality of the seizure of the pseudoephedrine from the Explorer.  At the time of the search, the officers had no knowledge concerning the ownership of the Explorer.  Rather, they knew only that the Explorer was parked in the garage and that McJunkin was sitting in the driver's seat, with the door open, listening to music.  Without any particular reason to believe that the vehicle parked in Wightman's garage did not belong to Wightman himself, the police could have reasonably construed Wightman's unequivocal consent to search the garage as extending to the vehicle parked therein.  While it does not appear that Wightman had actual authority to consent to a search of the vehicle, the constitutionality of a search does not turn on the factual accuracy of the officer's beliefs. *Illinois v Rodriguez*, 497 US 177, 185; 110 S Ct 2793; 111 L Ed 2d 148 (1990).  Instead, the officer must reasonably believe that consent was validly provided. *Id*. at 186 (explaining that the Fourth Amendment is not violated when an officer enters without a warrant based upon a reasonable, albeit erroneous, belief that the person who provided consent had authority to do so).

controlled substance . . . ." Thus, in convicting McJunkin of this crime, the jury found sufficient evidence to establish the following elements beyond a reasonable doubt: (1) that McJunkin provided a chemical or laboratory equipment to another person, (2) that McJunkin knew or had reason to know that the chemical or laboratory equipment was going to be used to manufacture a controlled substance, and (3) that the controlled substance was methamphetamine.

It is undisputed that the controlled substance that was being manufactured in Wightman's garage was methamphetamine, as confirmed by the forensic expert at trial. As such, there was sufficient evidence to establish the third element of the offense. There was also sufficient evidence to establish the second element of the offense—that McJunkin knew that Wightman and McCowen were in the process of manufacturing methamphetamine. McJunkin all but informed Officer Huggett that he was aware of this fact when he told Officer Huggett on the night of the incident that he no longer hangs out with anybody who manufactures or cooks methamphetamine and that his presence that evening was "a fluke." Lastly, Wightman testified that he, McCowen, and McJunkin all had the idea to make methamphetamine. The jury found Wightman to be a credible witness despite McJunkin's attempts to undermine Wightman's testimony, and this Court will not interfere with that determination. See *Fletcher*, 260 Mich App at 561. Based on the foregoing, there was sufficient evidence to convince a rational trier of fact that McJunkin was aware of the methamphetamine activity taking place in Wightman's garage, in satisfaction of the second element of the charge. See *People v Lee*, 243 Mich App 163, 167-168; 622 NW2d 71 (2000) (providing that "circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime").

Turning to the remaining element of the offense, McJunkin argues that the evidence was insufficient to establish that McJunkin provided a chemical or laboratory equipment to another person. We disagree. As already noted, Wightman testified that he, McJunkin, and McCowen planned to manufacture methamphetamine together. Although Wightman did not indicate that McJunkin provided chemicals or equipment for the process, the prosecution presented evidence that McJunkin had purchased pseudoephedrine less than two weeks before he was discovered alongside the active, one-pot methamphetamine laboratory in Wightman's garage. Additionally, Officer Burgess testified that people intending to cook methamphetamine generally have to stagger their purchases of pseudoephedrine because of federal regulations that track and limit the quantity of pseudoephedrine purchased by an individual in a 30-day period. McJunkin was sitting in the driver's seat of the Explorer when the police arrived, and approximately 30 grams of crushed powder containing pseudoephedrine was discovered in the vehicle directly next to where McJunkin had been sitting. Viewing the evidence in the light most favorable to the prosecution, the jury could reasonably infer that McJunkin provided the pseudoephedrine found in the Explorer for use in manufacturing methamphetamine. See *Lee*, 243 Mich App at 167-168.

Furthermore, the jury was also instructed that it could find McJunkin guilty under an aiding-and-abetting theory if it determined that he intentionally assisted someone else in committing the crime. See MCL 767.39 ("Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense."). "The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v Moore*, 470

Mich 56, 63; 679 NW2d 41 (2004). Again, Wightman testified that he, McJunkin, and McCowen planned to cook methamphetamine together and that, as part of the plan, he and McCowen were supposed to purchase pseudoephedrine. Wightman admitted that he purchased pseudoephedrine as agreed upon before reconnecting with McJunkin and McCowen at his home, where they began the process of manufacturing methamphetamine. Evidence from a state-wide pharmaceutical tracking system demonstrated that McCowen had also purchased pseudoephedrine that day. From this evidence, the jury could have found that McJunkin counseled and encouraged others to provide a chemical to be used in manufacturing methamphetamine and, therefore, that the first element of the offense was satisfied under an aiding-and-abetting theory. Either way, there was sufficient evidence from which the jury could find McJunkin guilty beyond reasonable doubt.

## IV. EVIDENCE OF PAROLE STATUS

Next, McJunkin argues that the trial court violated his right to due process when it admitted Officer Huggett's testimony regarding McJunkin's former parole status. Specifically, Officer Huggett testified that McJunkin "[s]aid *since he got off of parole*, he's only used [m]ethamphetamine one time and he doesn't[] hang out with anybody that cooks or manufactures [m]ethamphetamine anymore and that tonight was a fluke." (Emphasis added). Although the trial court erred in admitting the reference to McJunkin's former parole status, the error does not warrant reversal.

"A trial court's discretionary decisions concerning whether to admit or exclude evidence will not be disturbed absent an abuse of that discretion." *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010) (quotation marks and citation omitted). A trial court has not abused its discretion if its decision falls within the range of principled outcomes. *Waclawski*, 286 Mich App at 670. "When the decision involves a preliminary question of law however, such as whether a rule of evidence precludes admission, [the question is reviewed] de novo." *Mardlin*, 487 Mich at 614.

In *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994), the Michigan Supreme Court established the following test for the admission of evidence of other crimes, wrongs, or acts under MRE 404(b): (1) the evidence must be offered for a proper purpose under MRE 404(b);[3] (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by unfair prejudice; and (4) the trial court may provide a limiting instruction. Relevant evidence is "evidence that is material (related to any fact that is of consequence to the action) and has probative force (any tendency to make

---

[3] MRE 404(b)(1) provides, in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material . . . .

the existence of a fact of consequence more or less probable than it would be without the evidence)." *People v Sabin (After Remand)*, 463 Mich 43, 57; 614 NW2d 888 (2000). However, when the only relevance of the other crimes, wrongs, or acts is to establish the defendant's propensity to commit crime, the evidence is not admissible. *Waclawski*, 286 Mich App at 670. "The fact that defendant was a parolee is irrelevant to his guilt or innocence . . . ." *People v Deblauwe*, 60 Mich App 103, 105; 230 NW2d 328 (1975).[4] Thus, the circumstances in which a defendant's former parole status, without more, satisfies the above conditions are few.

Before the trial, the prosecution informed the trial court that it sought to introduce McJunkin's statement to Officer Huggett as a declaration against penal interest. However, McJunkin's statement regarding his status as a former parolee—on its own—simply does not fall under that hearsay exception. Indeed, the mere fact that McJunkin had been on parole was not probative of any fact of consequence. Thus, McJunkin's former parole status was not relevant or admitted for a proper purpose under MRE 404(b). To the extent that the balance of his statement was admissible, the trial court could have instructed Officer Huggett not to mention McJunkin's reference to parole. For these reasons, the trial court abused its discretion when it admitted evidence of McJunkin's former parole status.[5]

Nevertheless, although the admission of this evidence constituted error, reversal is not warranted. An "[e]videntiary error does not require reversal unless after an examination of the entire cause, it appears more probable than not that the error affected the outcome of the trial in light of the weight and strength of the properly admitted evidence." *People v Benton*, 294 Mich App 191, 199; 817 NW2d 599 (2011), citing MCL 769.26. McJunkin's former parole status was mentioned only twice and was not given particular emphasis by the prosecution. Any prejudice flowing from the mention of McJunkin's former parole status is unlikely to have affected the outcome of the proceedings in light of the weight and strength of the other evidence implicating McJunkin in the charged crime, namely, Wightman's testimony and McJunkin's presence at an active methamphetamine laboratory. *Benton*, 294 Mich App at 199.

---

[4] "Published cases issued before November 1, 1990, are not precedentially binding on this Court, although they may be persuasive authority." *People v Barbarich*, 291 Mich App 468, 476 n 2; 807 NW2d 56 (2011), citing MCR 7.215(J)(1).

[5] Furthermore, contrary to the prosecution's assertions at oral argument before this Court, we do not view Officer Huggett's testimony describing McJunkin's statement as a nonresponsive answer. At trial, the prosecution asked Officer Huggett "what statements" McJunkin had made, and Officer Huggett referred to McJunkin's parole status in the context of responding to that question, albeit after the prosecution had interrupted the testimony to inquire about another statement that was repeated by Officer Huggett first. In any event, the prosecution's pretrial motion to admit McJunkin's statements, including the specific reference to his parole status, negates any suggestion that the evidence was inadvertently elicited.

## V. COMPETENCE TO STAND TRIAL

In his Standard 4 Brief, McJunkin argues that the trial court violated his right to due process when it failed to sua sponte hold a hearing to determine whether he was competent to stand trial. We disagree.

McJunkin argues that he suffered an injury under the Due Process Clause of the Fourteenth Amendment. Constitutional questions are generally reviewed de novo. *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006). However, McJunkin failed to preserve this issue for review by raising it before the trial court. "The effect of an unpreserved claim of constitutional error is reviewed for plain error affecting substantial rights." *Id*. The plain-error rule involves a three-pronged test. *Id*. at 279. The defendant must show that: "(1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected a substantial right of the defendant." *Id*. "Generally, the third factor requires a showing of prejudice—that the error affected the outcome of the trial proceedings." *Id*. However, even if the defendant shows plain error that affected a substantial right, reversal is only warranted when "the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings . . . ." *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (quotation marks and citation omitted; alteration in original).

Under MCL 330.2020(1), a criminal defendant is presumed to be competent to stand trial and will only be deemed incompetent if "he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner." Furthermore, "a trial court has the duty of raising the issue of incompetence where facts are brought to its attention which raise a bona fide doubt as to the defendant's competence." *People v Kammeraad*, 307 Mich App 98, 138; 858 NW2d 490 (2014) (quotation marks and citation omitted). "Evidence of a defendant's irrational behavior, a defendant's demeanor, and a defendant's prior medical record relative to competence are all relevant in determining whether further inquiry in regard to competency is required." *Id*. at 139. However, "[a] defendant shall not be determined incompetent to stand trial because psychotropic drugs or other medication have been or are being administered under proper medical direction . . . ." MCL 330.2020(2).

To support his claim of incompetency, McJunkin states that he has undergone extensive psychiatric care, including admittance to a psychiatric ward and the prescription of antipsychosis medication. However, McJunkin's prescribed medications have no bearing on the determination of his competency, MCL 330.2020(2), and the record before this Court does not support his assertion of having undergone extensive psychiatric care.[6] There is no indication that McJunkin engaged in irrational behavior or otherwise displayed an unusual demeanor that would raise a bona fide doubt as to his competency to stand trial. *Kammeraad*, 307 Mich App at 139. To the contrary, McJunkin filed an affidavit raising concerns about access to legal research materials

---

[6] According to McJunkin, his presentence investigation report (PSIR) refers to his history of psychiatric care. However, the PSIR was not produced for this Court's review.

and his attempts to contact his attorney. He also attached a letter written to his attorney in which he identified a number of actions he believed would be helpful to his defense. On this record, it appears that McJunkin was indeed capable of understanding the nature of the proceedings and rationally assisting counsel in his defense.[7] Thus, the trial court did not violate McJunkin's right to due process by failing to sua sponte hold a hearing to determine McJunkin's competency.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, McJunkin argues in his Standard 4 Brief that he was denied the effective assistance of counsel when defense counsel failed to investigate his competency and present a defense of insanity at trial. We disagree.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id*. These factual findings are reviewed for clear error. *Id*. Because McJunkin did not request a new trial or evidentiary hearing, our review of his ineffective assistance of counsel claim is limited to errors apparent from the record. *People v Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002).

A defendant who claims to have been denied the effective assistance of counsel must satisfy a two-pronged test set forth in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001). The reviewing court determines "(1) whether counsel's performance was objectively unreasonable and (2) whether the defendant was prejudiced by counsel's defective performance." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "The defendant must overcome the presumption that the challenged action could have been sound trial strategy." *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004). To find prejudice, a court must conclude that there is "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *People v Pickens*, 446 Mich 298, 312; 521 NW2d 797 (1994) (quotation marks and citation omitted). Stated otherwise, "the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin*, 463 Mich at 600 (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case." *Id*. (quotation marks and citation omitted).

---

[7] Other cases that have found that the competency of a defendant should have been sua sponte addressed by the trial court required significantly greater facts suggesting incompetency than those present here. See, e.g., *People v Whyte*, 165 Mich App 409, 413-414; 418 NW2d 484 (1988) (finding that competency should have been determined before the defendant pleaded guilty when the defendant was diagnosed with schizophrenia, showed signs of depression, delusion, and hallucinations and was determined to be disabled by the Social Security Income program).

Defense counsel could have reasonably concluded that the facts of this case would not have raised a bona fide doubt as to McJunkin's competency. Accordingly, McJunkin cannot overcome the presumption that defense counsel's failure to investigate McJunkin's competency could have been sound trial strategy. See *Grant*, 470 Mich at 485. Defense counsel also exercised professional judgment in determining which defense had the best chance with the jury and was best supported by the evidence. Under MCL 768.21a(1), an individual is legally insane if, as a result of mental illness or intellectual disability, "that person lacks substantial capacity either to appreciate the nature and quality of the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." Again, there is nothing in the record or trial court transcript that indicates that McJunkin could meet this definition. In light of the absence of facts supporting an insanity defense and McJunkin's burden of proving the defense of insanity by a preponderance of the evidence, MCL 768.21a(3), defense counsel's decision not to pursue this defense could have been a matter of trial strategy. See *Grant*, 470 Mich at 485. Defense counsel could have reasonably concluded that the facts of this case did not support an insanity defense and that presenting an unsupported affirmative defense would have undermined the strength of the chosen defense theory, i.e., that McJunkin had nothing to do with the methamphetamine production taking place in the garage. Accordingly, defense counsel was not objectively unreasonable for failing to investigate McJunkin's competency or present an insanity defense.

Furthermore, McJunkin cannot demonstrate prejudice. To find prejudice, "the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin*, 463 Mich at 600. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case." *Id*. (quotation marks and citation omitted). As discussed above, the facts in this case do not support an incompetency determination. Even if McJunkin underwent a competency examination and was found to be incompetent, McJunkin would still be tried for the offense if he was found to be competent during the next 15 months. See, e.g., MCL 330.2032; MCL 330.2044. In light of the unpredictability of these contingencies, McJunkin cannot show a reasonable probability that the result of the trial would have been different if defense counsel had investigated McJunkin's competency. See *Carbin*, 463 Mich at 600.

Similarly, according to the facts in this case, McJunkin would not meet the definition of "legally insane" under MCL 768.21a(1). For this reason, and because an insanity defense must be proven by the defense by a preponderance of the evidence, McJunkin cannot show that there is a reasonable probability that, had defense counsel pursued an insanity defense, the factfinder would have had a reasonable doubt respecting guilt. See *Carbin*, 463 Mich at 600. In sum, McJunkin was not denied the effective assistance of counsel.

Affirmed.

/s/ William B. Murphy
/s/ Elizabeth L. Gleicher
/s/ Anica Letica